KENNETH RAY BLANTON *v.* STATE OF ARKANSAS

5448                                    458 S. W. 2d 373

Opinion delivered October 12, 1970

*Victor Hlavinka, Richard S. Arnold* and *Morris S. Arnold,* for appellant.

*Joe Purcell,* Attorney General; *Sam Gibson,* Asst. Atty. Gen., for appellee.

J. FRED JONES, Justice. Kenneth Ray Blanton was convicted of first degree murder in the Miller County Circuit Court and was sentenced to life imprisonment. He has appealed to this court and has designated 18 points on which he relies for reversal. All of the points allege error in law, so we only state the facts necessary for consideration of the assigned errors in the order presented.

About 10 p.m. on Sunday, December 15, 1968, the nude body of Winn Smith was found by Sandy Carter and Don La Rue in the bathroom of his apartment in Texarkana, Arkansas. Smith's bed was saturated with blood and a trail of blood led from Mr. Smith's bedroom through a hallway to the bathroom where his body was found. Two teeth and fragments of a heavy bronze candleholder were found on the bedroom floor. A broken candleholder and a butcher knife were found in the bathtub and Mr. Smith's automobile, his wrist watch and wallet were missing. His trousers, with the hip pockets turned inside out, were found on the living room floor. Mr. Smith's body bore 17 stab wounds in

addition to scalp and face lacerations. He was obviously the victim of a brutal murder. About midnight, December 16, 1968, the appellant, Kenneth Ray Blanton, was apprehended while asleep in Mr. Smith's late model Chrysler automobile in a roadside park near Sierra Blanca, Texas. He was returned to Texarkana and put on trial under a plea of "not guilty."

Appellant's point I:

The trial court erred in denying defendant's motion for payment of public funds to supply defendant with investigative, psychiatric, and other services necessary to his defense."

Under this point the appellant argues in his brief as follows:

"The Supreme Court of the United States has not addressed directly the issue of auxiliary assistance on due process grounds, but the question has been considered by several lower federal courts. Each of them has concluded—we think erroneously—that the due-process clause does not require that such auxiliary assistance be provided by the state. Typical of these cases is *United States ex rel. Smith* v. *Baldi*, 192 F. 2d 540 (3d Cir.) (1951)."

The appellant insists that we should adopt the view expressed in the dissenting opinion in *Baldi* where, as stated by the appellant, the dissenting justice said:

" '[A]s civilization progresses our ideas of fundamental fairness necessarily enlarge themselves . . . the requirement[s] of due process . . . would not be met by the appointment of a layman as counsel. The appointment of counsel for a deaf-mute would not constitute due process of law unless an interpreter also was available. Nor, in our opinion, would the appointment of counsel learned in the law fulfill the requirement of due process if that counsel required the assistance of a psychiatrist in order to prepare an insane client's defense.' "

We conclude that the opinions of the federal courts as expressed by the *majority* in *U. S. v. Baldi, supra,* are correct. It may be true that "as civilization progresses our ideas of fundamental fairness. necessarily enlarge themselves," but civilization has not progressed to the point where only insane persons commit murders. When civilization does arrive at that point, perhaps the presumption of insanity will attend the commission of crime and the state will owe a duty to one charged with murder, to prove him innocent by reason of insanity rather than guilty beyond a reasonable doubt. At the present stage of civilization, and under the laws of this state, one charged with the commission of crime is presumed innocent until proven guilty; and the state bears the burden of proving the defendant guilty beyond a reasonable doubt with the defense of insanity available to the defendant. The state has always had the burden of proving the defendant guilty and has never had the duty nor the authority of proving the defendant innocent by reason of insanity. The majority opinion in *U. S. v. Baldi, supra,* went on to say:

> "Due process does not go so far as to require a hearing on mental condition in any particular manner or at any particular stage in the proceedings. Certainly it does not require a hearing *in limine* on the question as counsel for relator contend. The most that it requires, in our view, is an opportunity to have adequate hearing on the question before guilt is finally determined.

> \* \* \*

> Furthermore, we have great difficulty in accepting as a proposition of constitutional law that one accused of crime is entitled to receive at public expense all the collateral assistance needed to make his defense. . ."

Consequently we feel constrained to follow the *majority* opinions of the federal courts as announced in *U. S. v. Baldi, supra,* and our own majority opin-

ions. In *Green* v. *State,* 222 Ark. 308, 259 S. W. 2d 142, the defendant was committed to the State Hospital and found insane. The court then appointed a panel of doctors who found him sane. He was tried and convicted and we reversed, holding that the court was without authority to appoint such panel. See also *Hale* v. *State,* 246 Ark. 989, 440 S. W. 2d 550. The appellant did not plead insanity as a defense in the case at bar; had he done so, or had he indicated an intent to do so, psychiatric examinations would have been available without expense to him under §§ 43-1301—43-1312, supra.

Appellant's point II:

"The trial court erred in denying defendant's motion for a confidential psychiatric examination to be administered by the Arkansas State Hospital."

This assignment of error is also answered in *Hale* v. *State, supra,* and we find no merit in appellant's contentions under this point.

Appellant's point III:

"The trial court erred in denying defendant's motion to dismiss the prosecution on the grounds that it was not initiated by a grand jury indictment."

Appellant's contention under this point was laid to rest in the 1937 case of *Penton* v. *State,* 194 Ark. 503, 109 S. W. 2d 131, and the numerous cases that followed. See *Washington* v. *State,* 213 Ark. 218, 210 S. W. 2d 307, and the cases there cited. We find no merit in appellant's point III.

Appellant's point IV:

"The trial court erred in overruling defendant's motion to quash the jury panel for racial discrimination practiced in its selection."

Under this assignment the appellant argues that the jury commissioners practiced racial discrimination in selecting the jury panel by systematically excluding Negroes therefrom. The appellant is a white man. In the case of *Woodruff* v. *Breazeale,* 291 F. Supp. 130 (1967), the issue was whether the petitioner (a white man) could claim the systematic exclusion of Negroes from the jury lists, and from the grand and petit juries of Calhoun County, Mississippi, where he was indicted and tried, as a violation of his rights under the 14th Amendment. The court in that case quoting from the decision in *Fay* v. *New York,* 332 U. S. 261, said:

"This Court however, has never entertained a defendant's objections to exclusions from the jury except when he was a member of the excluded class."

This decision was affirmed by the Fifth Circuit Court of Appeals in 401 F. 2d 997. We reached the same results in *Haraway* v. *State,* 203 Ark. 912, 159 S. W. 2d 733, where a Negro alleged prejudicial error because all white persons were purposely excluded from the jury that indicted him. We find no merit in appellant's point IV.

Appellant's point V:

"The trial court erred in denying defendant's motion that jury commissioners be instructed to make their selection of veniremen upon a random selection basis."

We find no merit in this assignment. The court instructed the commissioners to select the prospective jurors from all walks of life, from both sexes, from all races and from all parts of the community with regard only to the statutory qualifications of jurors. They were instructed to practice no discrimination in making their selections.

Appellant's point VI:

"The trial court erred in denying defendant's mo-

tion for a continuance so as to allow defendant to investigate the nature and make-up of the jury panel to determine its economic class composition."

This assignment is likewise without merit. In the case of *Figeroa* v. *State*, 244 Ark. 457, 425 S. W. 2d 516, we said:

"Whether a case should be continued or not is generally a matter resting within the sound discretion of the trial court, and unless it clearly appears that the refusal to grant a continuance is an abuse of discretion so as to operate as a denial of justice, the trial court's action does not constitute a ground for a new trial. *Allison* v. *State*, 74 Ark. 444, 86 S. W. 409; *Smith* v. *State*, 219 Ark. 829, 245 S. W. 2d 226. Absent a showing by the moving party that he has exercised due diligence, the trial court will not be held to have abused its discretion in refusing to grant the motion. *Bullard* v. *State*, 159 Ark. 435, 252 S. W. 584; *Bowman* v. *State*, 213 Ark. 407, 210 S. W. 2d 798; *Gerlach* v. *State*, 217 Ark. 102, 229 S. W. 2d 37."

We hold that the trial court did not abuse its discretion in the case at bar.

Appellant's points VII and VIII are as follows:

"VII. The special trial judge erred in overruling defendant's motion to disqualify the jury commissioners on the grounds that racial discrimination was practiced in their selection.

VIII. The special trial judge erred in excluding testimony by the trial judge relative to possible discrimination practiced by him in selecting jury commissioners for other counties within his circuit."

These points are so closely related to each other and they both are so closely related to point IV, we consider

our discussion under point IV sufficiently disposes of the errors alleged under points VII and VIII, and that these points are without merit.

Appellant's point IX:

"The trial court erred in denying defendant's motion for mistrial based on prosecutor's remarks in closing argument alluding to the fact that defendant remained silent until trial."

The remarks complained of under this assignment are abstracted by the appellant as follows:

"It was admitted by him that he needed money. In fact, he has admitted the State's whole case with the prime exception of what happened in that apartment. *Why has the defendant not told anyone about how it happened before? His explanation has come too late.*"

The appellant testified in his own defense at the trial and the remark complained of was not directed at the appellant's failure to testify at this trial, but was directed at his silence during the preliminary investigation. The court instructed the jury as follows:

"I will instruct the jury. Mrs. Mitchell and Gentlemen of the jury, I instruct you that the defendant, Kenneth Ray Blanton in this case, and any defendant in any criminal case, while it is being investigated, has a right under the 5th Amendment to the United States Constitution, and a right under the Arkansas State Constitution, to remain silent; that is, not to make any statements whatsoever, and you may not draw any inferences from this defendant's failure to make any statement, or exculpatory remark. You will decide this case strictly upon the evidence produced before you in this court, and the law as contained in the charge, and will draw no inferences or presumptions of guilt from the fact, if it is a fact, that the defendant remained silent."

We agree with the appellee that the trial court judge in his role of supervising the conduct of criminal trials before him, has wide discretion in determining the propriety of counsel's argument. *Adams* v. *State,* 176 Ark. 916, 5 S. W. 2d 946. A wide range of discretion is allowed circuit judges in dealing with the arguments of counsel before the jury, since the presiding judge can best determine the effect of unwarranted arguments at the time the argument is made. We also agree with the appellee that the trial court delivered to the jury immediately a careful and complete admonition to consider only the evidence properly admitted at the trial and we find no abuse of discretion under this assignment.

Appellant's point X:

"The trial court erred in overruling defendant's objection to the admission of fingerprint and palmprint specimens taken from defendant without his being fully warned of his constitutional rights and appraised of his right to remain silent and refuse to provide such specimens."

We agree with the appellee that appellant's assignment of error under this point has been decided adversely to the appellant's contention in *Shannon* v. *State,* 207 Ark. 658, 182 S. W. 2d 384, and the cases there cited. We still adhere to our holding in that case.

Appellant's point XI:

"The trial court erred in denying defendant's motion for new trial on the ground of newly discovered evidence."

Officer Gachot, of the Little Rock Police Department, testified for the state that the appellant was known as "Junior" to the vice squad in Little Rock, and that he and another vice squad officer had occasion to stop an automobile in which the appellant was a passenger on June 8; that the appellant stated on that occasion

that he was a homosexual. The newly discovered evidence proffered by the appellant in support of his motion for a new trial, was the testimony of a Mrs. Clark Robinson of Dallas who would testify that the appellant worked at her Waffle House in Dallas 61 hours during the week ending June 9, 1968. In the recent case of *Gross* v. *State*, 242 Ark. 142, 412 S. W. 2d 279, we said:

"Newly discovered evidence is one of the least favored grounds of a motion for new trial. . . Such a motion is addressed to the sound legal discretion of the trial judge and an appellate court will interfere only in case of an apparent abuse of discretion or injustice to the movant. . . He must show clearly that the evidence has been discovered since the trial. . . Such a motion is also properly overruled if the applicant therefor does not state acts on his part which constitute reasonable diligence to discover the evidence before trial."

In *Steel* v. *State*, 246 Ark. 75, 436 S. W. 2d 800, an amended motion for a new trial asserted that new evidence had been discovered that would impeach the evidence of a witness for the state. In sustaining the trial court's denial of the motion for new trial, we said:

". . . [W]e are not persuaded that the trial court abused its discretion, and this feeling is strengthened by the fact that no request for a continuance was made when Dinger was called to testify."

Mrs. Robinson's testimony would have only gone to the impeachment of Officer Gachot's testimony, and in a number of cases we have held that the new discovery of such evidence is not grounds for a new trial. *Foster* v. *State*, 45 Ark. 328; *Edgeman* v. *State*, 183 Ark. 17, 34 S. W. 2d 753; *Therman* v. *State*, 205 Ark. 376, 168 S. W. 2d 833; *Philyaw* v. *State*, 224 Ark. 859, 277 S. W. 2d 484; *Cooper* v. *State*, 246 Ark. 368, 438 S. W. 2d 681.

Appellant's point XII:

"The court erred in overruling defendant's objections to alleged oral admissions."

We find no merit in this assignment. The evidence indicates that neither Officer Newman of the Texas Highway Patrol, nor Justice of the Peace Rose, solicited or attempted to solicit incriminating information from the appellant. The evidence is to the effect that after the appellant was fully warned of his constitutional rights, he voluntarily attempted to explain his possession of the Chrysler automobile, the wallet and the wrist watch, none of which belonged to him. He made no statements, nor were any statements solicited from him in Texas concerning the charge on which he was tried. The statements he did make were voluntarily made and the trial court so found at a thorough evidentiary hearing. Furthermore, the appellant reiterated and explained from the witness stand all the statements he made prior to his trial.

Appellant's point XIII:

"The trial court erred in denying defendant's motion to exclude all evidence obtained as a result of Statements illegally elicited from defendant."

Our opinion as to point XII also applies to point XIII with the exception that during his interrogation in Texarkana, the appellant specifically availed himself of his right to remain silent on any matter pertaining to the theft of the automobile, as well as to the murder of Smith for which he was tried. We are of the opinion that the trial court did not err in holding that the admissions the appellant did make to the officers pertaining to his identity, residence and activity while in Texarkana were freely and voluntarily made.

Appellant's point XIV:

"The trial court's instruction to the jury relative to circumstantial evidence was erroneous."

The instruction complained of was as follows:

"In cases where circumstantial evidence is relied upon, it is necessary in order to convict, not only that the circumstances should point to and be consistent with the defendant's guilt, but also that they should be inconsistent with any other reasonable hypothesis. This does not mean any more than this: That all the facts and circumstances in the whole case be taken together; if they should convince you of his guilt beyond a reasonable doubt, they are sufficient to convict; if they do not, they are not sufficient to convict."

The appellant objected to this instruction and offered the following which was denied:

"You are instructed that where the State relies *entirely* on circumstantial evidence, it is necessary in order to convict not only that such chain of circumstances should point to, and be consistent with the defendant's guilt, but that the chain of circumstances should be inconsistent with any other reasonable hypothesis." (Emphasis supplied).

The appellant contends that the court should have pointed out in the instruction that the evidence was "entirely" circumstantial. We do not agree. Such instruction might well have been interpreted as a comment on the evidence. The instruction as given was correct especially in light of the additional instructions on the burden of proof and reasonable doubt. *Trammell* v. *State,* 193 Ark. 21, 97 S. W. 2d 902.

Appellant's point XV:

The court erred in instructing the jury on felony murder."

We find no merit in this assignment: The appellant was in possession of the decedent's automo-

bile, wallet and wrist watch when apprehended. He testified from the witness stand that Smith had given him the keys to the automobile for temporary use; that he used the automobile for about an hour while Smith was talking to Sandy Carter on the telephone, and that when he returned to Smith's apartment, he found Smith dead in the bathroom. He testified that he examined Smith's body and upon determining that he was dead, he took Smith's trousers from the bedroom closet door, searched the pockets and took some change; that he took Smith's watch from a nightstand, threw the trousers on the living room floor, wiped the blood from his hands on a wash towel he found in the bathroom, and after throwing the wash towel on the living room floor, he left for Texas in Smith's automobile. He testified that he searched the automobile for money in New Boston, Texas and found Smith's wallet in the locked glove compartment. As a matter of fact, except for the vicious nature of the homicide, robbery would appear the most likely, if not the only motive.

We might comment here that Sandy Carter testified that he was a homosexual and that he had engaged in homosexual practices with Smith. The appellant testified that Smith picked him up on a street; that he resisted homosexual advances made by Smith; that he accepted Smith's offer to share Smith's apartment, and that he had gone in Smith's automobile to get his clothes from his own apartment when Smith's murder occurred. Throughout the trial the evidence, on behalf of the appellant, was slanted toward a theory of so-called "homosexual homicide," with Sandy Carter as the most likely perpetrator of the crime. Evidence as to the vicious nature of the attack was the only evidence pointing to such a motive. The decedent was an extra large man, who wore size 14 shoes, and was well over six feet tall. Heavy bronze candelholders and a butcher knife were the apparent murder weapons. The decedent's bedcovers were turned down in a triangle from the pillow only on the front side of the bed, and the exposed bedsheet at this point was soaked in blood. The blood led from the bed down a hall and into the bathroom

where the evidence indicates that the decedent finally fell and his body was found. Candles and metal fragments from the candleholders accompanied the trail of blood. The bathroom walls and fixtures were splattered with blood and remnants of the broken candleholders were found in the bedroom, as well as with the butcher knife in the bathtub. A number of the 17 stab wounds were in the decedent's upper left chest. Such evidence would justify a conclusion that a murder, perhaps more difficult than the perpetrator had anticipated, which began by wielding a candleholder or knife while the decedent lay on his bed in the bedroom, and ending with knife thrusts to the most vital areas of his semiconscious body in the bathroom where he had finally retreated, was more consistent with the theory of robbery by a casual acquaintance or a stranger than by a close associate obsessed with homosexual jealousy. We conclude that the instruction was entirely proper.

Appellant's point XVI:

"The trial court erred in excluding certain testimony from the witness Don La Rue."

The decedent was last seen alive on Saturday night when he left Don La Rue's home about 10 o'clock. Sandy Carter was a business partner of Smith and was also at La Rue's home when Smith was there. Smith, Carter and La Rue tentatively planned to go to Ashdown on a business trip the following day, Sunday afternoon. Carter testified that he attempted to contact Smith by phone several times on Sunday morning without success, and finally about 1 p.m. he wrote a note to Smith requesting Smith to get in touch with him. He testified that he went by Smith's apartment and after noticing Smith's automobile missing from its usual parking place, he entered the living room of the apartment and left the note on a small stool in the living room. When first interviewed by the police officers, Carter admitted going by the apartment but denied that he entered it. Later he admitted entering the apartment and leaving the note on the stool in the

living room. He testified that he carried a key to Smith's apartment and that after leaving the note, he then stopped by some friends' apartment on the ground floor of the same building and drank a beer with them before leaving the building. He denied noticing anything amiss in the apartment when he left the note.

When Smith failed to contact either Carter or La Rue on Sunday afternoon, they went to his apartment about 10 p.m. to check on him and they discovered his body. Mr. La Rue testified that when he and Carter entered the living room, he noticed a small washcloth on the living room floor with spots of blood on it; that he then noticed a pair of trousers on the floor and a spot of blood on the doorfacing leading from the living room into the hall towards the bath and bedroom; that he then noticed some small fragments of metal as well as a candle on the living room floor which he later determined had come from heavy bronze candleholders which had originally set on a credenza in the living room.

The assignment of error under point XVI had to do with two questions put to Mr. La Rue as follows:

"Q. Isn't it unlikely that a person entering the apartment by the front door, and walking to the stool, which path would carry him across the doorway, so to speak, from the living room into the hallway, could have failed to see something amiss or untoward, a body in the bathroom?

\* \* \*

Q. Isn't it unlikely that a person entering by the front door and going to the stool could have missed seeing the washcloth, if he had gone directly between those two points?"

These questions were objected to for the reason that they called for a conclusion and the objections were

sustained. The appellant argues that La Rue was competent to testify as to what could or could not be seen from a certain part of the apartment. The trial court agreed with the appellant's argument on this point and so do we, but the questions were not framed in conformity with the argument or with the offer of proof. Under offer of proof on this point, the questions, answers, and the court's ruling thereon appear as follows:

"Q. Mr. La Rue, standing in the living room at the point where the washcloth, or towel, was located on the diagram there, could a person see fairly well into the bathroom?

A. Yes, sir, well enough to discern objects.

Q. All right, sir, and towel that is shown on the diagram as being in the living room, is that object obvious?

A. It would be obvious to me.

MR. R. S. ARNOLD: That's all, Your Honor.

THE COURT: Well, those questions and answers are perfectly proper."

It was called to the court's attention, and the appellant's counsel agreed, that the questions propounded were not couched in the same language as in the offer of proof. The difference is obvious as above set out and we agree with the state and with the trial court that the above questions put to La Rue called for a conclusion and were incompetent.

Appellant's point XVII:

"The trial court erred in denying the defendant's motion for a change of venue."

Mr. Bernard Landrum, an insurance adjuster employed to assist in the defense investigation, testified

that he had talked with hundreds of people attempting to get them to sign a petition and affidavits for change of venue, and that Dale Foster was the only one he could get to sign the petition. Mr. Landrum was asked the following question and gave the following answer:

"Q. Did you in the course of your work in this regard come into contact with any persons who were of the opinion that the defendant could not receive a fair trial in the county, but who were still unwilling to sign the affidavit?

A. Well, I had it put to me this way: 'I don't know whether he is guilty or not, and possibly he isn't, but I still will not sign.' "

On cross-examination Mr. Landrum testified:

"Q. Is it not true that the majority of the people you talked to just didn't want to get involved on either side of the case?

A. This is, I would say, a big part of it, that many people did not want to become involved."

Mr. Perry Dale Foster testified that in his own opinion the appellant could not receive a fair trial because of the prominence of the decedent's family. He testified that he does not know the attitude of other citizens of Miller County, but only attempted to express his personal feelings in his affidavit. Nine witnesses testified for the state to the effect that the appellant could obtain a fair trial in Miller County and we are of the opinion that the trial court did not abuse its discretion in denying the motion. See cases cited in footnotes to Ark. Stat. Ann. § 43-1502 (Repl. 1964) under "Credible Persons—Basis of Opinion" and "Discretion of Court."

Appellant's point XVIII:

"The trial court erred in overruling defendant's

motion for continuance upon discovery by his counsel, on the morning of trial, that the state was in possession of a bloody palm print identified as belonging to defendant."

In his argument on this point the appellant states:

"Defense counsel anticipated, correctly as it turned out, that the bloody palm print would be a crucial item of evidence in the case against the defendant. They immediately moved for a continuance on the ground that had such evidence been known to the defense it would have been necessary to consider seriously the defense of insanity, and the question of whether defendant should be sent to the State Hospital for examination. The untimely revelation of the palm print evidence was a complete surprise to defendant and his counsel."

The record does not sustain the appellant in this argument. This assignment of error has to do with the state's exhibit No. 36 which was a palm print, lifted from the bathtub in the decedent's apartment, with flecks of blood appearing in the print itself. Detective Weir first testified that the prints were lifted under his supervision and directions, but objections were sustained to Detective Weir's testimony for the reason that the prints had not remained in his possession and he was unable to positively identify the print offered in evidence as being the same one lifted at the scene of the crime.

Officer Giles was then called as a witness and he testified as follows:

"Q. Mr. Giles, did you assist in removing any other prints?

A. Fingerprints?

Q. Yes, or palm prints.

A. A palm print.

Q. Where was this palm print that you assisted in lifting?

A. The palm print was in the bathroom on the bathtub, on the corner of the bathtub.

Q. What was the condition of it?

A. It was made in blood.

Q. I show you this lift and ask you if you can identify it?

\* \* \*

A. I can.

Q. Is that the same lift and palm print that was lifted there in your presence?

A. It was.

\* \* \*

Q. Is there anything else that you noticed about that palm print other than the identification characteristics?

A. Are you talking about the specks of blood on it?

Q. Yes, sir.

A. There were specks of blood that was lifted with the lift when the palm print was lifted off the tub."

After the motion was argued pro and con the defendant's counsel concluded as follows:

"Well, if your Honor please, we are not complaining that they didn't show us the lifts. As a matter of fact, it is true, as counsel for the State says, that we were advised of the existence of the lifts and told that we could see them if we wished to. We did not wish to, because we did not think that fingerprint configurations would be meaningful to us. The part that we object to, and the part that was not revealed, was the business of the blood. We think there has not been a compliance with the order about the blood samples—and tests made of blood samples—a specific and independent portion of this court's order."

The court then ruled as follows:

"Counsel, as I understand the position of each party, the defense motion to bar the introduction of the lifts will be denied, and I understand the representation of the State that no blood samples or tests were made, and therefore none will be offered in evidence.

The motion for continuance will be denied."

All of the witnesses who testified concerning palm and fingerprints found in Smith's apartment, testified that they were made in blood. There was ample evidence that the palm print on the bathtub from which exhibit No. 36 was lifted was made in blood, and the mere fact that flecks of the blood were lifted with the print could in no wise prejudice the appellant. There was no evidence or contention that it was the appellant's blood appearing on the palm print exhibit offered in evidence. The flecks of blood appearing on the lifted print had nothing whatever to do with identifying the appellant as the one who left the bloody palm print on the bathtub. The flecks of blood identified in the print lifted from the bathtub could only have gone to help identify the lifted palm print offered in evidence as being from the bloody palm print found on the bathtub.

The judgment is affirmed.