[Crim. No. 14026. In Bank. June 16, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
SIRHAN BISHARA SIRHAN, Defendant and Appellant.

716

## COUNSEL

George E. Shibley, Luke McKissack, Abdeen Jabara, Grant Cooper, Russell Parsons, Robert E. Mundy, Martha Goldin, Godfrey Isaac and Ernest L. Graves for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

BURKE, J.—A jury found defendant guilty of first degree murder of Senator Robert Kennedy and fixed the penalty at death for that crime.

The jury also found defendant guilty on five counts charging assault with a deadly weapon with intent to commit murder upon Paul Schrade, Irwin Stroll, William Weisel, Elizabeth Evans and Ira Goldstein respectively, and prison sentences were imposed on those counts. The court denied a motion for a new trial, and defendant's automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

Defendant contends that (1) the death penalty is cruel or unusual punishment; (2) in view of proof of his diminished capacity the evidence is insufficient to support the first degree murder conviction; (3) he was denied a fair trial as a result of certain publicity; (4) his right to be secure against unreasonable searches and seizures and his privilege against self-incrimination were violated by the receipt of evidence found in his bedroom and in his yard; (5) other evidence was erroneously admitted; (6) his constitutional rights were violated by having the prosecution initiated by an indictment rather than an information; (7) the court erred in failing to hold an evidentiary hearing on whether the exclusion of veniremen opposed to the death penalty results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction; and (8) the petit and grand juries were illegally selected.[1]

*People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], holds that the death penalty violates our state constitutional provision against cruel or unusual punishment (Cal. Const., art. I, § 6). The first of defendant's contentions thus is meritorious. We have concluded that the other contentions set forth above cannot be upheld and that the judgment should be modified to provide for life imprisonment and as so modified affirmed.

At the trial it was undisputed that defendant fired the shot that killed Senator Kennedy. The evidence also established conclusively that he shot the victims of the assault counts. The principal defense relied upon by defendant was that of diminished capacity. Extensive evidence was presented of the circumstances surrounding the shootings and of defendant's mental condition, which evidence may be summarized as follows:

About 8:30 p.m. on June 2, 1968, two days before defendant shot Senator Kennedy, the senator made a speech in the Coconut Grove at the

---

[1]Defendant also contends that the court abused its discretion when it rejected his offer to plead guilty to first degree murder with punishment fixed at life imprisonment and that for several reasons, in addition to the cruel or unusual punishment claim, the death penalty should be set aside. It is unnecessary to reach these contentions in view of our holding in *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], that the death penalty is unconstitutional.

Ambassador Hotel in Los Angeles, following which he delivered a second speech outside the hotel. Defendant was seen at the hotel about 8:45 that night by an acquaintance. A half hour or less after the senator's second speech a hostess saw a man who looked like defendant in the kitchen near the Coconut Grove.

During the day on June 4, 1968, defendant practiced firing at a gun range for several hours and had also practiced shooting at ranges on several prior occasions. On June 4 he engaged in rapid fire with the .22 revolver he used a few hours later to kill Senator Kennedy. The revolver had been obtained by defendant in February 1968 when his brother Munir paid a fellow employee for it.

A person who talked with defendant at the gun range on June 4 testified that defendant stated he was "going to go on a hunting trip with his gun," that he told defendant it was not permissible to use pistols for hunting "because of the accuracy," and that defendant said, "Well, I don't know about that. It could kill a dog."

About 10 or 11 p.m. on June 4, 1968, a secretary whose duties included seeing that unauthorized persons were not near the Embassy Ballroom of the Ambassador Hotel, saw defendant near that room and asked him who he was, and he turned and walked toward the doors leading into the ballroom.

Shortly before midnight on the same day defendant asked hotel employees if Senator Kennedy was going to come through the pantry, and they told him that they did not know. One of the employees observed defendant for about a half hour in the pantry and noticed nothing unusual about his manner or activity.

About midnight on June 4, Senator Kennedy made a speech in the Embassy Ballroom announcing his victory as a Democratic candidate for president in the California primary. Following the speech he and his entourage proceeded toward the hotel's Colonial Room, which was then being used as a press room. En route the senator stopped in the pantry to shake hands with the kitchen staff. Suddenly defendant darted toward the senator, pulled out a revolver, and fired several shots. The senator and a man adjacent to him, Paul Schrade, fell. Pandemonium ensued.

A hotel employee grabbed defendant around the wrist of the hand holding the gun, but defendant, who was still able to move that hand, continued shooting. Irwin Stroll, William Weisel, Elizabeth Evans and Ira Goldstein were injured by the gunfire. Several persons joined in the struggle and succeeded in restraining defendant, and one took the gun

from him. When asked "Why did you do it?," defendant replied something to the effect "I can explain."

The senator was taken to a hospital where he underwent surgery. He subsequently died on June 6, 1968. According to the autopsy surgeon, the cause of death was a gunshot wound "to the right mastoid" that penetrated the brain; the senator also received two additional gunshot wounds, one in an armpit and another slightly lower. Expert testimony indicated that the gun was an inch and a half or less from the senator's head when the fatal bullet was fired and in contact with him or within a few inches when the other wounds were inflicted.

Around the time that the senator was taken to the hospital the police arrived at the hotel and took custody of defendant. Two officers, defendant, and Jesse Unruh got into a car and drove to the police station. En route the officers advised defendant of his constitutional rights. Subsequently Unruh asked defendant "Why did you shoot him?" and defendant replied "You think I am crazy? You think I will tell you so you can use it as evidence against me?" Unruh also heard defendant say "I did it for my country." Unruh believed that defendant was not intoxicated, and police officers who were with defendant at the time of his arrest or shortly thereafter reached the same conclusion.

About 12:45 a.m., minutes after defendant arrived at the police station, he was seen by Officer Jordan. The officer estimated that he was with defendant between four and five hours on this occasion. Jordan stated that defendant never appeared irrational and that in the officer's many years on the force defendant was "one of the most alert and intelligent people I have ever attempted to interrogate." Jordan initially identified himself and asked defendant his name but received no response. The officer then advised defendant of his constitutional rights, and defendant, after asking a few questions, indicated he wished to remain silent. Defendant, Jordan, and other officers subsequently discussed various matters other than the case. Tapes of the conversations were played to the jury.

The police found various items on defendant's person, including a newspaper article which in part noted that in a recent speech Senator Kennedy "favored aid to Israel 'with arms if necessary' to meet the threat of the Soviets."

A trash collector testified that on one occasion he told defendant he was going to vote for Kennedy in the primary election and that defendant replied "What do you want to vote for that son-of-a-b for? Because I'm planning on shooting him." On cross-examination the witness admitted that following the assassination when asked if he would testify he stated

he "would not want to take the oath because [he] hated Sirhan so much that [he] would do anything to see him convicted."

The prosecution also introduced documents found by the police at defendant's home. The documents contain statements in defendant's handwriting regarding various matters including, inter alia, killing Senator Kennedy.[2]

Defendant, testifying in his own behalf, admitted having shot Senator Kennedy, but claimed that he did not remember having done so. He conceded, however, that he stated "I killed Robert Kennedy wilfully, premeditatively, with twenty years of malice aforethought." (The context in which this statement was made is set forth later herein.) Defendant further testified that he "must have," or had no doubt that he, shot the victims of the assault counts.

Defendant's account of what transpired on June 4 and 5, was as follows: He intended to go to the races on June 4, but did not like the entries and decided to go target shooting instead. He took his revolver to a gun range, stopping en route to buy ammunition, and stayed at the range until about 5 p.m. He practiced shooting there but was not the person who engaged in rapid fire. He had gone to gun ranges on several prior occasions and practiced with the gun because he "liked to" and "was interested . . . in . . . target practicing perfection." He first developed an interest in guns as a member of a high school cadet corps. He did not recall making a statement about killing a dog. He might have said "it [apparently his gun] is strong enough to kill an animal," but he did not have in mind killing Senator Kennedy. After leaving the range, he stopped to eat and subsequently saw an article concerning a march for Israel, which made him angry. He drove to the area where the march was scheduled but found it was not on that date. On the drive he passed Thomas Kuchel's headquarters and went in. There someone mentioned a "bigger party" at the Ambassador. The person did not mention whose party it was, and defendant did not know there was to be a Kennedy party that night. He went to the Ambassador, was mad at the Zionists, and started to drink. He bought two Tom Collins during about an hour. He does not recall how many drinks he had that evening. After a while he felt high and returned to his car to go home but was afraid to drive because of his condition and decided to return to the hotel for coffee.

He did not recall picking up his gun but as a result of what subsequently

---

[2]The contents of the documents are set forth more fully hereinafter in connection with the discussion of defendant's claim that the admission of the documents was improper.

transpired he realized he must have done so. Upon returning to the Ambassador, he found some coffee and talked with a girl. The next thing he remembered he was being choked.

He did not remember asking anyone "where Kennedy was going to come through" and did not know if he asked "what time [Kennedy] would be there." He did not remember saying "I did it for my country" but "Jesse Unruh must have been correct in saying that [defendant made the statement]." He recalled getting into the police car, being advised of his constitutional rights, and various other matters following his arrest.

Defendant also admitted having gone to the Ambassador Hotel on June 2 where he heard Senator Kennedy speak but denied having been in the kitchen that night. He stated that the senator "looked like a saint" but that defendant still had in the back of his mind a broadcast in which the senator committed himself to sending jet bombers to Israel.

Defendant denied having made the statement to the trash collector regarding killing Senator Kennedy.

Defendant further testified regarding his background as follows: He is a Palestinian Arab. He was born in 1944 in New Jerusalem, and in 1948 he and his family moved to Old Jerusalem where they remained until coming to the United States in 1956. Throughout his eight years in Old Jerusalem there were intermittent bombings. He attended school there. His family lived under poor conditions in Old Jerusalem [e.g., the whole family resided in one room with grossly inadequate toilet facilities]. He was told they were living as they were because "The Jews kicked us out of our home." He was also told of a massacre in which 250 people including children were slaughtered in cold blood by the Jews. While living in Old Jerusalem he went to a well for some water, and when the bucket came up it contained a hand and it sickened him. On one occasion he saw the exploded remains of a grocer he knew. In 1956 he heard about aggression by Israel against the Arabs in the Suez Canal. About a year after they came to the United States his father returned to Jordan. In 1963 defendant graduated from high school and subsequently attended college but was dismissed in 1965 after missing classes. He thereafter worked with horses but left his job in 1966 and did not find another job for a year. He read everything available on the Arab-Israel conflict and on the occult, in which he became interested in 1965. He joined the Rosicrucian Order in 1965. He performed several experiments such as concentrating on a mirror and seeing the face of Robert Kennedy instead of his own.

Defendant also described in detail his views regarding the Arab-Israel conflict and his hatred of the Zionists.

Additional evidence was introduced by the defense regarding the bombings in Old Jerusalem during the period defendant resided there, the various gruesome matters he saw during his childhood, and his poor living conditions in that city. Several defense witnesses also testified that they saw defendant with a drink in his hand on the night of June 4, 1968.

In support of his defense of diminished capacity defendant called to the stand two psychiatrists Eric Marcus, M.D. (a court-appointed psychiatrist) and Bernard Diamond, M.D.; two psychologists who administered psychological tests to defendant (Drs. Orville Richardson and Martin Schorr) and four psychologists who evaluated the tests administered to defendant by Dr. Richardson and/or Dr. Schorr (Drs. Stephen Howard, William Crain, Georgene Seward, and George De Vos).

Doctors Marcus and Diamond testified that at the time of the alleged murder defendant was a paranoid schizophrenic, and Dr. Diamond further stated that defendant was then in a "dissociated state of restrictive consciousness as a . . . consequence of [his] psychotic condition." According to both psychiatrists, defendant lacked the capacity to maturely and meaningfully reflect upon the gravity of the contemplated act of murder and to comprehend his duty to govern his actions in accord with the duties imposed by law, and they explained the reasons for their conclusion. They further testified concerning the origin, development, and manifestations of the illness.

Doctors Richardson, Schorr, Crain, De Vos and Seward likewise testified that defendant was a paranoid schizophrenic, and, according to Dr. Schorr, defendant went into a dissociate state before the shooting. Doctors Richardson and Schorr also agreed with the psychiatrists that defendant lacked the capacity to maturely and meaningfully reflect upon the gravity of his contemplated act of murder and to harbor malice aforethought.

Dr. Howard concluded that defendant has "paranoid features" and is "a borderline psychotic person," i.e., a person "who can go in and out of psychosis, depending on the . . . relative minor stresses . . . in daily life."

In rebuttal the prosecution called to the stand Seymour Pollack, M.D., a professor of psychiatry and law at the University of Southern California. Dr. Pollack interviewed defendant eight times, spending about 24 hours with him. The first such interview was on January 19, 1969. The doctor also observed defendant in the courtroom during preliminary proceedings that began June 28, 1968, and during the trial. In addition he interviewed members of defendant's family; reviewed the psychological tests given by

Drs. Richardson and Schorr to defendant and numerous other matters such as the grand jury transcript and tapes of defendant's conversations after his apprehension; and attended a conference with other psychiatrists and psychologists concerning the case. The overall time Dr. Pollack spent on the case was close to 200 hours.

With respect to his diagnosis, Dr. Pollack testified: Defendant was not "clinically psychotic," i.e., there were "no observable signs or symptoms to a degree and of a kind that would allow [the witness] as a psychiatrist to say that [defendant] was mentally ill as a psychotic person." There was insufficient proof of schizophrenia.[3]

On the other hand, according to Dr. Pollack, defendant is, and was at the time of the killing and for "some time before that," mentally ill and emotionally disturbed, and his mental illness was substantial, i.e., of a degree and kind that is not present in most of the population.

Dr. Pollack concluded that defendant is a paranoid personality, which is not a psychosis but a form of mental illness in which there is an exaggeration of certain personality characteristics. Such a personality is more suspicious and sensitive than most people, "takes things more personally to a greater degree than the average person," and tends to collect grievances.

Dr. Pollack testified that defendant also is "a borderline schizophrenic," i.e., "a person who has . . . or shows some minimal evidence of peculiarity in his thinking, in his feeling . . . but who doesn't have, who hasn't shown . . . any clnical signs or symptoms of psychosis." According to Dr. Pollack, there are indications that defendant has "a psychotic personality structure," and a person with such a structure is not "held together as well" and becomes "more easily unglued than ordinary."

Dr. Pollack further stated: Defendant demonstrated evidence of psychosis in the psychological tests. However, in the interviews he did not have the degree of personality disorganization that the doctor would have expected from the tests, although the interviews revealed specified matters indicating the possibility of psychosis. For example, during the interviews after the initial ones defendant exhibited a degree of paranoid thinking with accompanying emotional responses that led the witness to suspect that there were psychotic characteristics in his personality. "[T]he paranoid

---

[3]With respect to schizophrenia, the doctor stated: He found no evidence defendant had psychotic delusions or peculiarity of thinking. Nor did defendant display autism, a state in which an individual lives largely within himself. In this connection the doctor noted matters such as defendant's having gone to the racetrack and having worked several months in 1967 and 1968. Dr. Pollack also did not find that defendant exhibited two other symptoms of schizophrenia, namely a marked splitting between his emotional life and his acting and ambivalence.

element" is quite strong in defendant's notebooks, but Dr. Pollack did not believe that the notebooks were evidence of psychosis since he found none of the peculiarities therein that would have been "more definite proof of [defendant's] being clinically psychotic." The doctor believed the repetitious statements in the writing relating to killing Senator Kennedy were examples of defendant's attempts to strengthen "his courage [and] capability to carry out his intention to kill Kennedy." Part of the writing was not "the writing of a healthy mature mind." He acknowledged that had he spent many additional hours with defendant it is possible or probable that more definite evidence of psychosis would have been found.[4]

Dr. Pollack traced defendant's life history and the effect of various incidents upon him. He stated, inter alia, that "defendant's personality standard as it was on June 5, 1968, was related to the experiences he had as a boy, experiences in Jerusalem and these all, significantly, substantially affected him to a certain extent and were related to what he did." Dr. Pollack stated that he believed that defendant was exposed to the turmoil and violence that accompanied the Arab-Jewish conflict but that he had no material that defendant had any greater exposure than others in his family and community and that there were many times they were reasonably secure. Dr. Pollack believed that in spite of defendant's early life experiences defendant developed "into a much stronger person than others believe him to be," although "these experiences to some degree left [him] vulnerable in the development of this subsequent character formation . . . ."

Dr. Pollack further testified that "I believe the assassination of Senator Robert Kennedy was triggered by political reasons with which [defendant] was highly emotionally charged; I believe that Sirhan focused on Senator Robert Kennedy as an individual who should die, not only because of the Kennedy promise to give Israel the jet bombers that would cause death to thousands of Arabs, in Sirhan's opinion, but also because Sirhan wanted the world to see . . . how strongly our United States policy was in the pro-Israel-anti-Arab movement in . . . spite of our Government's pro-fessed interest for the underdog, and world justice" and "Sirhan . . . saw himself as a defender of the Arab cause and, as an individual who through

---

[4]Dr. Pollack indicated that he had not asked for more time with defendant because at the conference Dr. Diamond led him to believe that Dr. Diamond "no longer wanted [him] to participate." However, at the conference Dr. Pollack stated that "I don't think [interviewing defendant further] is going to be majorly productive because he continues to be, and I think he will for some time . . . quite defensive still. I know he is aware of the circumstances. He very much . . . does not want to be seen as a crazy fellow. He wants his act to be perceived as that of an Arab nationalist who committed the assassination. He would rather that he be seen this way and go to the gas chamber than to be seen as a crazy man. . . ."

this act would bring world attention to the Arab plight and also . . . materialize his fantasy of success."

He testified, "In my opinion when Sirhan shot Kennedy, Sirhan's mental capacity was not impaired to the extent of diminished capacity to maturely and meaningfully premeditate and deliberate and reflect upon the gravity of the contemplated act of shooting the Senator" and that Sirhan "did not have . . . diminished mental capacity to harbor malice aforethought." The doctor explained that he considered the following "functions" in reaching the foregoing conclusions: He found no evidence of any altered state of consciousness or dissociate state, and various matters indicated to the contrary. For example, testimony of eyewitnesses showed defendant was aware of the significance of questions asked him and the tape recordings of his conversations at the police station indicated "a great deal of reasoning ability." There was no substantial impairment of his attention (i.e., ability to attend to his environment in a meaningful manner), perception (i.e., ability to perceive objects in a meaningful manner, using past experiences), understanding (i.e., ability not simply to know but to appreciate "in a fuller sense"), ability to associate ideas logically, and freedom of choice. His emotions were "not that disturbed." He was becoming more irritable and explosive but there was no substantial evidence that "this was an impulsive explosion." His foresight (i.e., his ability to look forward and plan) appeared to be reasonably intact, and the same was true regarding his memory.

Dr. Pollack stated that mental capacity is on a continuum, ranging from zero (close to absence of capacity) to 100 percent (which none attain); that psychiatrists are not specialists as to where society wants to draw the line, but that as a psychiatrist he "can say that if an individual is considered to have . . . substantial impairment of any of these functions it should be below 50 percent" and those persons with a substantial impairment of any of the recited functions would have diminished capacity.

Dr. Pollack further testified that in his opinion defendant's mental illness "affected" what he did "some" but not "enough" and that it related to the assassination. In a report to the district attorney Dr. Pollack stated, "Sirhan's mental illness was related to his act of assassination in that his paranoid convictions went beyond those of a normal personality in the average citizen . . . . This mental illness should be considered a substantial mitigating factor on the issue of penalty. . . ."

Dr. Pollack also testified that defendant believed it was "good" and "right" to kill Senator Kennedy and had that belief when he made the entries in his notebooks. Defense counsel then asked, "As a matter of fact,

he felt it was his duty almost to do it, didn't he?", and Dr. Pollack replied, "Almost, yes. As an Arab he felt that it was his duty, that he would be looked up to by the Arab world and that he would be considered a hero." Dr. Pollack indicated that he did not consider defendant's belief that it was "right" and "good" to kill the senator a delusion and stated that "it's there that I think a major difference exists between the other psychiatrists and myself."[5] He testified defendant gave no evidence of believing himself to be a person chosen by God to kill Kennedy whom he regarded as the devil—that such a belief would have been a delusion. Dr. Pollack further testified that defendant did not expect to be punished for his act because in his view Kennedy and others having the senator's views about the Arab-Israel conflict were murderers.

Leonard Olinger, a clinical psychologist, was also called in rebuttal by the prosecution. He contacted the prosecution after concluding on the basis of news reports that some of Dr. Schorr's testimony was unwarranted by the material presented to support it. The prosecution furnished Dr. Olinger with, among other things, the tests given to defendant by Drs. Schorr and Richardson. So far as appears Dr. Olinger never personally examined defendant. After criticizing various interpretations given to defendant's test responses by other witnesses and techniques employed in administering certain of the tests, Dr. Olinger stated that in his opinion it appeared from the tests that defendant was "a borderline schizophrenic with primary neurotic features." He stated that on the basis of the capacity demonstrated by the tests, such an individual could maturely and meaningfully premeditate and deliberate to commit the act of murder. He further stated that the tests suggest that defendant had the capacity to comprehend his duty and to conform it to the dictates of society.

### 1. *Sufficiency of Evidence to Support First Degree Murder Conviction*

■ Defendant contends that in view of proof of his diminished capacity the evidence is insufficient to support his conviction of first degree murder and that he should have been convicted of manslaughter or at most second degree murder.

■ " 'It has long been settled under the *Wells-Gorshen* rule of diminished capacity that in cases other than those where a felony murder is charged, a defendant cannot be convicted of murder of the first degree if, at the time of the alleged offense, he was operating under a mental disability not amounting to legal insanity that prevented him from acting with

[5]Dr. Pollack described a delusion as a belief that was, among other things, false, illogical, and quite fixed.

malice aforethought or with premeditation and deliberation.'" (*People* v. *Risenhoover,* 70 Cal.2d 39, 51 [73 Cal.Rptr. 533, 447 P.2d 925], quoting from *People* v. *Ford,* 65 Cal.2d 41, 54-55 [52 Cal.Rptr. 228, 416 P.2d 132].)

 The recited evidence, including, among other things, the expert testimony introduced by the prosecution and proof of the circumstances surrounding the crime, is sufficient to support the jury's implied finding that defendant committed the killing with malice aforethought. (Cf. *People* v. *Risenhoover, supra,* 70 Cal.2d 39, 51; *People* v. *Goedecke,* 65 Cal.2d 850, 854 et seq. [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213]; *People* v. *Nicolaus,* 65 Cal.2d 866, 869-878 [56 Cal.Rptr. 635, 423 P.2d 787].) It may be noted that at the trial defense counsel told the jury that in his opinion the evidence and law justified a second degree murder conviction.

We turn next to whether the evidence is also sufficient to support the jury's implied finding that the murder was wilful, deliberate and premeditated.

The meaning of deliberation and premeditation was elucidated in *People* v. *Wolff,* 61 Cal.2d 795, 821-822 [40 Cal.Rptr. 271, 394 P.2d 959], a case involving a 15-year-old boy who had a permanent form of schizophrenia according to undisputed psychiatric testimony and was charged with the murder of his mother. *Wolff* stated that the true test "must include consideration of the . . . extent to which . . . defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act. . . . Certainly . . . defendant had ample time for any normal person to maturely and appreciatively reflect upon his contemplated act and to arrive at a cold, deliberated and premeditated conclusion. He did this in a sense— and apparently to the full extent of which he was capable. But, indisputably on the record, this defendant was not and is not a fully normal or mature, mentally well person. He knew the difference between right and wrong; he knew that the intended act was wrong and nevertheless carried it out. But the extent of his understanding, reflection upon it and its consequences, with *realization of the enormity of the evil* [italics added], appears to have been materially—as relevant to appraising the quantum of his moral turpitude and depravity—vague and detached." *Wolff* theretofore had pointed out (at p. 820) that "'Dividing intentional homicides into murder and voluntary manslaughter was a recognition of the infirmity of human nature. Again *dividing the offense of murder into two degrees is a further recognition* of that infirmity and *of difference in the quantum of personal turpitude of the offenders. . . . [W]hen it is claimed that the homicide is by "any*

*other kind of willful, deliberate, and premeditated killing" there is necessity for an appraisal which involves something more than the ascertainment of objective facts. . . . [People v. Holt, 25 Cal.2d 59, 86 (153 P.2d 21);
italics added.]'* " (See also *People* v. *Bassett,* 69 Cal.2d 122, 124 et seq. [70 Cal.Rptr. 193, 443 P.2d 777]; *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 876-878; *People* v. *Goedecke, supra,* 65 Cal.2d 850, 855-858.)

Here, defendant had ample time to reflect upon the killing, and, although the evidence is conflicting, the heretofore summarized evidence constitutes substantial proof that at the time of the shooting defendant was not a paranoid schizophrenic, in a dissociate state, or intoxicated. Also, as we have seen, Dr. Pollack, who examined defendant on eight occasions as well as having reviewed extensive materials and interviewed members of defendant's family, testified that although defendant was mentally ill, defendant did not have diminished capacity to harbor malice aforethought or to maturely and meaningfully reflect upon the gravity of his contemplated act, and the doctor explained the reasons for his conclusions. There was also evidence that the assassination was politically motivated, and defendant's actions in carrying out the crime are, of course, additional proof of his then mental state. In addition a lay witness who observed defendant for about a half hour shortly before the killing noticed nothing unusual about defendant's manner or activity, and an officer who was with defendant for several hours shortly after the killing found him highly alert and intelligent.

We conclude that the evidence is sufficient to support the first degree murder conviction.

### 2. *Alleged Denial of Fair Trial as a Result of Publicity*

Defendant contends that as a result of publicity during the trial he was denied his right to an impartial jury in violation of the due process clause of the Fourteenth Amendment of the federal Constitution.

On February 5, 1969, the regular jury was sworn. On February 10, 1969, a motion to enter a plea of guilty to first degree murder provided that defendant receive life imprisonment was made in chambers and denied. The court ordered that the record pertaining to the motion be sealed. On February 11, 1969, the alternates were sworn. The court did not at this time sequester the jurors and alternates and instead allowed them to return to their homes until the following evening.[6] The court admonished them

---

[6]Comments of the court indicate that the reason for its decision in this regard was that it did not want the jurors and alternates to be confined in a hotel during the afternoon of February 11 and on February 12, a holiday.

not to discuss the case with anyone and "not to read any newspaper or any . . . article or listen to any TV or radio broadcast related to this case, and if you should inadvertently see or hear such report, you are to disregard it and not permit it to influence you in your deliberations."

On February 12, 1969, an article appeared in the Los Angeles Times bearing the headline *"Sirhan Guilty Plea Now Appears Likely—Defense Shift Could Shorten Trial, Avert Death Sentence."* (Italics added.) The article stated, among other things, that: "[I]t was learned that defendant *probably will plead guilty to first-degree murder* in the slaying of Sen. Robert F. Kennedy"; "The willingness of the three *defense lawyers* to change the plea is said to be based on their *conviction* that, while psychiatric evidence would not warrant a death penalty, *they could not hope for a jury verdict of less than first-degree murder*"; there had been an in-chambers discussion between defense and prosecution lawyers, and, although "both sides were uncommunicative about the reason for the meeting," the Times had "learned . . . that a possible change in plea was discussed." (Italics added.)

The newspaper article received radio coverage. The KFWB broadcast stated: ". . . Speculation arose this morning when the Los Angeles Times said Sirhan would probably change his plea, putting himself at the mercy of the jury. . . . Cooper would not discuss the newspaper claims that Sirhan himself was the one who wanted to change his plea to guilty in hopes of being sentenced to life imprisonment instead of death." KMPC and KNX broadcasts contained similar statements. Defense counsel represented that there was also television coverage of the matter.

The publicity on the subject was massive. In the words of the trial judge, "Everybody knows it has been on the radio every hour; it has been in the newspapers, certainly the Times . . . in the most important spot . . . ."

On February 13, 1969, defendant moved for a mistrial on the ground that he could not receive a fair trial as a result of the newspaper article and subsequent radio and television coverage. Both defense counsel and the prosecution assured the court that they had not been the source of the information in the article, and the court stated it was certain its staff had not revealed the information. At defendant's request the twelve jurors and six alternates were then questioned individually in chambers concerning the matter.[7]

With respect to the 12 jurors who rendered the verdicts it may be

---

[7]In urging that he was denied a fair trial defendant points in part to the responses of two jurors who were replaced before the jury retired for deliberations at the guilt

inferred from the record that none had read the *body* of the Times article. Several had heard or read either nothing or only comments of a general nature such as that "[a friend] thought there was not going to be a trial." At least four, however, had seen the Times *headline* or heard on the radio or television that defendant "was pleading guilty" or a comment by an acquaintance such as that defendant *"pled guilty"* or *"was going to plead guilty,"* and at least two indicated that they had also heard certain additional statements, which might have been viewed as suggesting that the *guilty plea* was *to first degree murder.*[8] Several stated that they could set aside anything they had heard or read and decide the case solely on the evidence produced in court and law as given by the court.

The trial court, in denying the motion for a mistrial, stated "practically everyone, if not everyone's responses to questions by the Court said they could set aside these matters if they did hear them and decide the case only on the evidence produced here in court and the law as stated to them by [the court]."

At the conclusion of the trial defendant made a motion for a new trial on the ground, among others, that the denial of his motion for a mistrial deprived him of an impartial jury, and the court denied the motion for a new trial.

■ "Due process requires that the accused receive a trial by an impartial jury free from outside influences. ■ Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances." (*Sheppard* v. *Maxwell,* 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507]; see also *Groppi* v. *Wisconsin,* 400 U.S. 505, 508

---

trial and two alternates who never became jurors. On February 11, 1969, the jurors and alternates were admonished "not to converse among yourselves . . . on this matter or anything pertaining to it. You are not to form or express an opinion until the matter is finally submitted to you for that purpose." No claim is made that the four in question violated the admonition by discussing anything pertaining to the case with any juror, and presumably they did not do so (Evid. Code, § 664; *People* v. *Sparks,* 257 Cal.App.2d 306, 309 [64 Cal.Rptr. 682]). It thus does not appear that whatever they read or heard could have deprived defendant of his right to an impartial jury.

[8]One juror stated that "Someone mentioned about a guilty plea or something like that" and that several said "Well, you may be there for a week." The responses of another juror show that he heard "about this case" on KFWB, and from the statements in the KFWB broadcast previously quoted it might be inferred that the speculation concerned a plea of guilty *to first degree murder.*

[27 L.Ed.2d 571, 574, 91 S.Ct. 490]; *Maine* v. *Superior Court,* 68 Cal.2d 375, 382, 384-385 [66 Cal.Rptr. 724, 438 P.2d 372].)

 In most cases involving claims of due process deprivations a showing of identifiable prejudice to the accused is required (see *Estes* v. *Texas,* 381 U.S. 532, 542-543 [14 L.Ed.2d 543, 549-550, 85 S.Ct. 1628]), but under some circumstances, there is such a probability of prejudice to the accused that prejudice is presumed. (E.g., *Sheppard* v. *Maxwell, supra,* 384 U.S. 333, 352 [16 L.Ed.2d 600, 614] [probability of prejudice from "totality of circumstances"]; *Estes* v. *Texas, supra,* 381 U.S. 532 [probability of prejudice from televising and broadcasting of trial]; *Turner* v. *Louisiana,* 379 U.S. 466, 473 [13 L.Ed.2d 424, 429, 85 S.Ct. 546] [probability of prejudice from key prosecution witnesses also serving as jury shepherds during trial]; *Rideau* v. *Louisiana,* 373 U.S. 723, 726 [10 L.Ed 2d 663, 665, 83 S.Ct. 1417] [probability of prejudice from television exposing the community "repeatedly and in depth to the spectacle of [the accused] personally confessing in detail to the crimes with which he was later to be charged."])

Here neither prejudice to defendant from the publicity nor a probability thereof is shown by the record, even if it be assumed that the jurors were unable to disregard the matters they had heard or seen relating to a guilty plea by defendant.[9]

Insofar as the jurors had heard or read only of (1) a guilty plea by defendant without any indication of whether it was to first degree murder or to a lesser crime or (2) statements of an even more general nature, it is unlikely that defendant was prejudiced by their being aware of the foregoing since at the trial defense counsel made it clear to the jury that the defense was not seeking an acquittal and that the sole issue was whether defendant was guilty of first degree murder, second degree murder, or manslaughter.[10] The matters heard or read by some of the jurors were

---

[9]A juror's declaration regarding his ability to act impartially or to set aside what he has heard or seen and decide the case solely on the evidence received at the trial is, of course, not under all circumstances controlling (see, e.g., *Irvin* v. *Dowd,* 366 U.S. 717, 728 [6 L.Ed.2d 751, 759, 81 S.Ct. 1639]; *Marshall* v. *United States,* 360 U.S. 310, 312-313 [3 L.Ed.2d 1250, 1251-1252, 79 S.Ct. 1171]; *People* v. *Tidwell,* 3 Cal.3d 62, 73 [89 Cal.Rptr. 44, 473 P.2d 748]), nor can it be assumed under all circumstances that jurors will follow instructions to disregard certain matters (see, e.g., *Bruton* v. *United States,* 391 U.S. 123, 126-137 [20 L.Ed.2d 476, 479-486, 88 S.Ct. 1620]; *Jackson* v. *Denno,* 378 U.S. 368, 388-389 [12 L.Ed.2d 908, 922-923, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; *People* v. *Aranda,* 63 Cal.2d 518, 525-526, 528-529 [47 Cal.Rptr. 353, 407 P.2d 265]).

[10]Defense counsel at the time of his motion for mistrial stated, "Defendant has told this jury in examining it on voir dire . . . that we are not seeking an acquittal,

thus not inconsistent with the position of defense counsel at the trial. Although part of defendant's own testimony indicated that he was unconscious at the time of the killing and the jury was instructed regarding unconsciousness as a complete defense, there was abundant proof that he was not then unconscious as was impliedly recognized by defense counsel in advising the jury that he was not seeking an acquittal.

Furthermore, it is significant that at the trial defense counsel introduced evidence of another, later occasion during the trial when defendant attempted to plead guilty to first degree murder, testimony by psychiatrists also referred to that later attempt, and on cross-examination defendant admitted having stated "I killed Robert Kennedy wilfully, premeditatively, with twenty years of malice aforethought."[11] (Cf. *Stroble* v. *California*, 343 U.S. 181, 195 [96 L.Ed. 872, 883, 72 S.Ct. 599], wherein the defendant claimed that he had been denied due process by certain news reports, and the court stated in part, "It is significant that . . . the confession which was one of the most prominent features of the newspaper accounts . . . was introduced in evidence at the trial itself"; see *People* v. *Tahl*, 65 Cal.2d 719, 731 [56 Cal.Rptr. 318, 423 P.2d 246]; 56 J. Crim. L., C. & P. S., pp. 13-14; see generally A.B.A. Standards Relating to Fair Trial and Free Press, Proposed Final Draft, December 1967, §§ 3.5, subd. (f), and 3.6; 24B C.J.S., Criminal Law, § 1927, subd. (c), p. 244.) Under the circumstances defendant was not prejudiced by the information of which some jurors were aware regarding a guilty plea to an undesignated crime or matters of an even more general nature. (Cf. *People* v. *Jacobson*, 63 Cal.2d 319, 330-331 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Cotter*, 63 Cal.2d 386, 397-398 [46 Cal.Rptr. 622, 405 P.2d 862] [vacated on another ground, 386 U.S. 277 (18 L.Ed.2d 43, 87 S.Ct. 1035)].)

Nor was he prejudiced by any additional statements heard by two or more of the jurors from which they might have inferred that the guilty plea was *to first degree murder* since the evidence received at the trial showed the later attempt to plead guilty to first degree murder and the above stated admission.

This case differs from *Rideau* v. *Louisiana*, *supra*, 373 U.S. 723, wherein the court apparently regarded as immaterial the fact that evidence similar

---

but that they had to determine whether it was murder in the first degree, murder in the second degree or manslaughter; that's the only issue." In his closing argument at the guilt trial defense counsel stated that "we are not asking for an acquittal" and that "I feel that the evidence and the law justifies . . . a verdict of guilty of murder of the second degree. . . ."

[11]Defendant contends that the court erred in admitting the evidence of the quoted admission, but, as we shall see, the court did not err in this regard.

to the publicity was received at the trial. *Rideau* held a conviction invalid on the ground that the denial of a motion for a change of venue was a denial of due process where the community had repeatedly been exposed to television broadcasts of a film in which the defendant confessed to the crimes with which he was later charged. Three jurors who convicted the defendant had seen at least one of the broadcasts. According to *Rideau,* "Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." It appears in the *Rideau* dissent that at the trial other confessions by the defendant were received in evidence, but the court apparently regarded that fact as immaterial. Here, however, the publicity of which the jurors had knowledge would have far less damaging impact on a juror than a home-viewed confession and would not necessarily render subsequent court proceedings "but a hollow formality."

3. *Asserted Violation of Right to Be Secure Against Unreasonable Searches and Seizures and Privilege Against Self-incrimination*

Defendant contends that his right to be secure against unreasonable searches and seizures (U.S. Const., 4th and 14th Amends.; Cal. Const., art. I, § 19), and privilege against self-incrimination (U.S. Const., 5th and 14th Amends.) were violated by the introduction by the prosecution of (1) several pages from two of his notebooks and an envelope that were found in his bedroom on June 5, 1968, and (2) an envelope that was found in a trash box in the rear yard of his residence on June 6, 1968.[12]

██ The Attorney General contends, inter alia, that defendant is precluded from claiming that the receipt of the foregoing evidence was error since the remaining pages of the notebooks were introduced into evidence by the defense and the defense used the entire notebooks and envelopes as proof of diminished capacity. The Attorney General asserts that the pages offered by the defense were more damaging than "those portions" offered by the prosecution "from the standpoint of showing [defendant's] praise of communism and hatred toward this country, stated in occasionally pro-

---

[12]The Fourth Amendment, made applicable to the states by the Fourteenth Amendment (*Mapp* v. *Ohio,* 367 U.S. 643, 655-657 [6 L.Ed.2d 1081, 1089-1091, 81 S.Ct. 1684]), provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . . ."

Article I, section 19, of the California Constitution contains a substantially similar provision.

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." This clause is made applicable to the states by the Fourteenth Amendment. (*Malloy* v. *Hogan,* 378 U.S. 1, 3 [12 L.Ed.2d 653, 656, 84 S.Ct. 1489].)

fane terms, and [defendant's] willingness to resort to political assassination,"[13] and the Attorney General claims that the introduction by the defense of the pages was not impelled by the prosecution's introduction of the subject evidence but by, if anything, a desire of the defense to use the notebooks in support of its defense of diminished capacity.

"It is, of course, difficult to unravel the many considerations that might have led" the defense to offer the pages. (See *Harrison* v. *United States,* 392 U.S. 219, 224 [20 L.Ed.2d 1047, 1052, 88 S.Ct. 2008].) However, we believe that there is at least a reasonable possibility that their introduction was impelled by the prosecution's introduction of part of the notebooks. (See *People* v. *Quicke,* 71 Cal.2d 502, 518 [78 Cal.Rptr. 683, 455 P.2d 787]; *People* v. *Spencer,* 66 Cal.2d 158, 168 [57 Cal.Rptr. 163, 424 P.2d 715].) It was only after the prosecution introduced part of the notebooks over objection, that the defense introduced the remaining pages. When defense counsel offered in evidence the first page of one notebook he stated he did so "For the purpose of showing all of [defendant's] writings and to explain the pages that have heretofore been offered in evidence . . . ." Presumably he did not have a different purpose for the other pages. The defense may have been seeking to show that the pages introduced by the prosecution, when viewed in the context of the notebooks in their entirety, should be considered by the jury as containing merely declarations of a mentally unbalanced person. Under the circumstances we are satisfied that defendant by introducing the remaining pages of the notebooks did not waive his right to contend on appeal that the introduction of the evi-

[13]For example, one of the pages introduced by the defense (which had been excluded by the trial court when the prosecution attempted to introduce it) stated in part "I advocate the overthrow of the current president of the fucken [*sic*] United States of America. I have no absolute plans yet—but soon will compose some. I am poor—This country's propaganda says that she is the best country in the world—I have not experienced this yet. . . . I firmly support the communist cause and its people—wether [*sic*] Russian, Chinese, Albanian, Hungarian or whoever—Workers of the World unite, you have nothing to loose [*sic*] but your *chains* and a world to win."

Other pages introduced by the defense stated, "2 June 67 . . . A Declaration of War Against America . . . When in the course of human events, it has become necessary for me to equalize and seek revenge for all the inhuman treatment committed against me by the American people the manifestation of this Declaration will be executed by its purporter (s) [*sic*] as soon as he is able to command . . . $2000 . . . and to acquire some firearms . . . . The victims of the party in favor of this declaration will be or are now—the president, vice etc—down the ladder. The time will be chosen by the author at the convenience of the accused . . . the author expresses his wishes very bluntly that he wants to be recorded by historians as the man who triggered off the last war . . . Sirhan must begin to work on uphold [*sic*] solving the problems and difficulties of assassinating the 36th president of the glorious United States."

dence by the prosecution was error. (See, e.g., *People* v. *Zavala,* 239 Cal. App.2d 732, 741 [49 Cal.Rptr. 129].)

The Attorney General has cited no authority that any use by defendant of the subject evidence after a defense objection thereto was overruled bars defendant from claiming error on appeal, and it would not seem that it would have that effect.

It is thus necessary to consider the merits of defendant's contentions.

A. Alleged Illegal Search and Seizure on June 5, 1968

A pretrial motion to suppress the evidence obtained in the June 5, 1968, search was made on the ground that the search and seizure were unlawful. The motion was denied following an evidentiary hearing. At the trial evidence was also received bearing on the matter. Defendant in effect made a second motion to suppress by making an "objection," and the "objection" was overruled.

On the morning of June 5, 1968, defendant's brothers, Adel and Munir, upon seeing a newspaper picture of defandant in connection with the Kennedy shooting, went to the police station, where Adel was interviewed by Sergeant Brandt, one of the officers who made the search. The officer then knew that the senator had been shot earlier that same morning and presumably was aware that the senator was the successful Democratic candidate for President in the California primary. The officer further knew that the suspect was in custody and apparently knew that the suspect's identity had not theretofore been revealed. Adel advised the officer of the suspect's identity and stated that he (Adel), his two younger brothers, Sirhan and Munir, and their mother lived at a specified address in Pasadena and that their father was in another country. The officer asked if they could search the home, and Adel replied that "as far as he was concerned [they] could, however it was his mother's house."[14] When asked if he wanted the police to call her for permission, Adel replied that she did not know what had happened and he did not want to alarm her.

Sergeant Brandt, accompanied by two other officers and Adel, then went to the Sirhan residence, arriving about 10:30 a.m. on June 5, 1968. Brandt testified that they "were interested in evidence of possible conspiracy in that there might be other people that were not yet in custody." He stated that there was nothing which "indicated [defendant] was engaged in any conspiracy" but that there was no evidence "there was not a conspiracy."

---

[14]Adel was a part owner of the house until 1963, when he and his mother deeded the property to her as the sole owner.

Adel admitted the officers into the house. They asked which bedroom belonged to defendant, and Adel directed them to a back bedroom. There the officers opened a closed dressing table drawer and found an envelope bearing the notation "RFK must be disposed of like his brother was." On the floor in plain sight they saw a closed notebook. They opened it to see its contents; it contained a prediction of America's downfall, an attack upon its leaders, and comments relating to "doing away" with those leaders. On top of the dressing table they saw a second notebook which looked "like a school book." They looked through it, and in it were notations such as "R.F.K. must be assassinated" and "Ambassador Goldberg must die." The envelope and pages from the two notebooks containing the foregoing comments were introduced into evidence by the prosecution. The handwriting on the envelope and in the notebooks was identified as defendant's.

Since the search was without a warrant, the burden was on the People to show proper justification therefor. (*People* v. *Edwards,* 71 Cal.2d 1096, 1099 [80 Cal.Rptr. 633, 458 P.2d 713]; *People* v. *Henry,* 65 Cal.2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557]; *People* v. *Haven,* 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927].) In the trial court one theory relied upon by the People was Adel's consent, and the trial court upheld the search on the ground that the officers had the consent of Adel, "one they conscientiously and reasonably believed . . . could grant authority."

Defendant argues on appeal that Adel had neither actual nor apparent authority to consent to a search of defendant's notebooks and dresser drawer. We need not, however, consider whether the search can be sustained on the basis of Adel's consent, since, as we shall see, the search was lawful upon another ground.

The Attorney General asserts that there was a pressing emergency to ascertain the existence of a possible conspiracy to assassinate presidential candidates or high government officials, and he relies on the emergency exception to the warrant requirement. Defendant, on the other hand, argues that no emergency was shown justifying the search, and he points to testimony that the officers had no evidence of a conspiracy.

■ As a preliminary matter it is necessary to consider whether the emergency theory was relied upon by the People in the trial court. ■ Ordinarily the People cannot introduce for the first time in the appellate court a theory to justify a search since the defendant, being entitled to assume that the only purported justification for the search is that advanced by the prosecutor, has no reason to cross-examine prosecution witnesses and adduce evidence of his own to rebut the theory argued for

the first time in the appellate court. (*People* v. *Superior Court (Simon)*, *ante*, p. 186 [101 Cal.Rptr. 837, 496 P.2d 1205]; *People* v. *Miller*, *ante*, p. 219 [101 Cal.Rptr. 860, 496 P.2d 1228].) ▮ Here at the motion for a new trial the prosecutor clearly enunciated that theory. Although the Attorney General has not directed us to any place where that theory was theretofore explicitly set forth in the trial court, we believe that the prosecutor's remarks and examination of witnesses during the hearing on the motion to suppress and trial gave defendant sufficient notice that the prosecutor was relying on that theory,[15] and defendant makes no argument to the contrary on appeal. Although at the motion for new trial defense counsel referred to the prosecution's "new suggestion," apparently referring to the theory in question, he made no claim that the defense was taken by surprise and his cross-examination in which he brought out that there was no evidence of a conspiracy suggests that he was not. We conclude that the People are not barred from urging the theory on appeal.

▮ We turn next to a consideration of whether the theory is a valid one. In *Johnson* v. *United States*, 333 U.S. 10, 14-15 [92 L.Ed. 436, 440-441, 68 S.Ct. 367], a case involving narcotics law violations, the court declared that "There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with." The court concluded that such circumstances were not there present, stating " . . . No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction . . . ."

The doctrine in *Johnson* v. *United States, supra,* 333 U.S. 10, 14-15, repeatedly has been reiterated by the United States Supreme Court. (See, e.g., *Vale* v. *Louisiana*, 399 U.S. 30, 34-35 [26 L.Ed.2d 409, 413-414,

---

[15]The prosecution's points and authorities filed in the trial court in opposition to defendant's motion to suppress related solely to Adel's consent. However, at the hearing on that motion the prosecution elicited the testimony from Officer Brandt that they "were interested in evidence of possible conspiracy in that there might be other people that were not yet in custody," and during oral argument at that time the prosecution, in addition to remarks regarding Adel's consent, stated "Here we had . . . an attempted assassination of a prominent public figure. We have a suspect in custody who refused to even give . . . identifying information . . . ." During the trial the prosecution stated, "I submit that . . . the officers . . . acted reasonably in reliance upon the consent . . . of [Adel] . . . ; that there was an emergency situation in existence at the time, and taking the total factual picture into account I think that it cannot be said that the officers acted unreasonably. . . ." Even though it does not appear from the foregoing that the prosecution mentioned the object of the possible conspiracy (the assassination of Senator Kennedy alone or of a number of prominent political leaders) it must have been obvious to defense counsel that the prosecution contemplated the latter object.

90 S.Ct. 1969];[16] *United States* v. *Jeffers,* 342 U.S. 48, 51-52 [96 L.Ed. 59, 64-65, 72 S.Ct. 93]; *McDonald* v. *United States,* 335 U.S. 451, 456 [93 L.Ed. 153, 158, 69 S.Ct. 191].) In *McDonald, supra,* which involved the crime of carrying on a lottery, the court, after concluding that no emergency there appeared justifying the search, stated, "We are not dealing with formalities. The presence of a search warrant serves a high function. *Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police.* This was not done to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade the privacy in order to enforce the law. . . . We cannot be true to that constitutional requirement and excuse the absence of a search warrant without *a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.*" (Italics added; see also *Coolidge* v. *New Hampshire,* 403 U.S. 443, 445 [29 L.Ed.2d 564, 570, 91 S.Ct. 2022]; *Chimel* v. *California,* 395 U.S. 752, 761 [23 L.Ed.2d 685, 692, 89 S.Ct. 2034].)

*Warden* v. *Hayden,* 387 U.S. 294, 298-300 [18 L.Ed.2d 782, 787-788, 87 S.Ct. 1642] held that "the exigencies of the situation made [the course there followed] imperative." In that case the police were informed that an armed robbery had taken place and that the suspect had entered a specified address less than five minutes before they reached it, and the court stated that the police "acted reasonably when they entered the house and began to search for a man of the description that had been given and for weapons which he had used in the robbery or might use against them." (See also *People* v. *Smith,* 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222] [cert. den. 388 U.S. 913 (18 L.Ed.2d 1353, 87 S.Ct. 2119); rehg. den. 389 U.S. 893 (19 L.Ed.2d 211, 88 S.Ct. 13)]; *People* v. *Terry,* 70 Cal.2d 410, 424 [77 Cal.Rptr. 460, 454 P.2d 36] [cert. den. 399 U.S. 911 (26 L.Ed.2d 566, 90 S.Ct. 2205); rehg. den. 400 U.S. 858 (27 L.Ed.2d 97, 91 S.Ct. 26)].)

The emergency or exigency theory has also been applied in cases where the officers' conduct was prompted by the motive of preserving life and reasonably appeared to be necessary for that purpose. (See, e.g., *People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721] [police heard moaning sound as if from person in distress, entered defendant's apartment, looked in several rooms, and found evidence in plain sight in the kitchen]; *People* v. *Superior*

---

[16]*Vale, supra,* in concluding that an exceptional situation was not there presented, stated in part, "The goods ultimately seized were not in the process of destruction." This language differs from that quoted above in *Johnson* v. *United States, supra,* 333 U.S. 10, 14-15, as the dissent in *Vale* pointed out (at p. 39 [26 L.Ed.2d at p. 416]).

*Court (Peebles)* 6 Cal.App.3d 379 [85 Cal.Rptr. 803] [circumstances suggesting the possibility of an unexploded bomb in an apartment held to constitute exigent circumstances justifying search]; *People* v. *Gomez,* 229 Cal.App.2d 781, 782-783 [40 Cal.Rptr. 616] [officer searched pockets of unconscious man having convulsions for purpose of discovering what was wrong with him].)

The Attorney General urges that the "exigencies of the situation" in this case likewise made it imperative for the officers to follow the course they took. The heretofore recited evidence indicates that the officers believed that there might be a conspiracy, and although none of the officers mentioned the object thereof they undoubtedly contemplated the obvious possibility of a conspiracy to assassinate political leaders in this country. It also may be inferred from the recited evidence that they believed that an emergency existed and that prompt action on their part was necessary.[17]

Their beliefs were entirely reasonable. The crime was one of enormous gravity, and the "gravity of the offense" is an appropriate factor to take into consideration. (See *People* v. *Schader,* 62 Cal.2d 716, 724 [44 Cal. Rptr. 193, 401 P.2d 665], quoting from a dissent by Mr. Justice Jackson in *Brinegar* v. *United States,* 338 U.S. 160, 182 [93 L.Ed. 1879, 1894, 69 S.Ct. 1302].) The victim was a major presidential candidate, and a crime of violence had already been committed against him. The crime thus involved far more than possibly idle threats. Although the officers did not have reasonable cause to believe that the house contained evidence of a conspiracy to assassinate prominent political leaders, we believe that the mere possibility that there might be such evidence in the house fully warranted the officers' actions. It is not difficult to envisage what would have been the effect on this nation if several more political assassinations had followed that of Senator Kennedy. Today when assassinations of persons of prominence have repeatedly been committed in this country,[18] it is essential that law enforcement officers be allowed to take fast action in their endeavors to combat such crimes.

The scope of the search must, of course, be " 'strictly tied to and justified

---

[17]Brandt testified that he conferred with his superior officer regarding a search of the home and was advised "to search the home if we had consent of . . . Adel." The foregoing, however, does not show that the officers did not believe there was an emergency. Rather they appear to have been acting with abundant caution.

[18]Pursuant to the Attorney General's request we take judicial notice that "only two months [before the assassination of Senator Kennedy] Reverend Martin Luther King, Jr., had been assassinated, and less than five years previously the victim's brother, President John F. Kennedy." (See Evid. Code, § § 452, subd. (h), and 459; 1971 World Almanac.)

by' the circumstances which rendered its initiation permissible. [Citations.]" (*Terry* v. *Ohio,* 392 U.S. 1, 19 [20 L.Ed.2d 889, 904, 88 S.Ct. 1868].) Officer Brandt testified that after Adel admitted them into the house they began "a general search" and that they went there to determine both "whether or not there was anyone else involved in [the crime]" and "whether or not there were any other things that would be relative to the crime." Even if the exigent circumstances in this case made lawful a warrantless search only for evidence of a possible conspiracy to assassinate prominent political leaders, it is clear from the record that the officers were searching for such evidence. (See *Warden* v. *Hayden, supra,* 387 U.S. 294, 299-300 [18 L.Ed.2d 782, 787-788].) Only a thorough search in the house could insure that there was no evidence therein of such a conspiracy.

Defendant's objection to the notebooks and envelope found in his bedroom and his pre-trial motion to suppress that evidence were on grounds other than that the notebooks and envelope were "communicative" or "testimonial" in nature so that their very nature precluded them from being the object of a reasonable search and seizure. (See *Warden* v. *Hayden, supra,* 387 U.S. 294, 302-303 [18 L.Ed.2d 782, 789-790]; *People* v. *Thayer,* 63 Cal.2d 635, 642-643 [47 Cal.Rptr. 780, 408 P.2d 108] [cert. den. 384 U.S. 908 (16 L.Ed.2d 361, 86 S.Ct. 1342)]; see generally A.L.I., A Model Code of Pre-arraignment Procedure, Proposed Official Draft No. 1 (April 1972) § 210.3, pp. 34-36.)[19] The issue whether the very nature of the notebooks and envelope precluded them from being the object of a reasonable search and seizure therefore will not be reviewed on appeal. (Evid. Code, § 353; *People* v. *Floyd,* 1 Cal.3d 694, 717 [83 Cal.Rptr. 608, 464 P.2d 64]; *People* v. *De Santiago,* 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353]; *People* v. *Washington,* 71 Cal.2d 1061, 1083 [80 Cal.Rptr. 567, 458 P.2d 479].) Even if defendant's memorandum in support of his

---

[19]When the evidence found in defendant's bedroom, together with the evidence found in the trash box, were offered defense counsel stated, "I object to the introduction of each of the exhibits . . . on the grounds, first, that they have been obtained in violation of defendant's constitutional rights, in this, that it was not a reasonable search or a seizure of anything in this, first, that they did not have a search warrant; second, that they had time to obtain a search warrant; third, that there was not reasonable nor probable cause to make the search; fourth, they did not have the defendant's permission to make the search and the defendant himself, had he been asked, would have objected to it; fifth, the consent of his brother was not his consent nor . . . would he have given consent to his brother, and his brother was not clothed with authority nor did he have ostensible authority to give permission to search the private rooms of the defendant," and defense counsel incorporated as part of the objection his argument and points and authorities presented at the time of his motion to suppress the evidence found in defendant's bedroom. The argument and points and authorities thus incorporated did not specify that the items were not subject to search and seizure due to their very nature.

motion for a new trial raised that issue, this did not constitute a timely motion to exclude the evidence on that ground.

We conclude that the trial court did not err in admitting the evidence found in defendant's bedroom.

### B. Alleged Illegal Search and Seizure on June 6, 1968

■■■ The prosecution introduced into evidence, over objection, an envelope on which appears writing (identified as defendant's) stating "RFK must be . . . disposed of properly Robert Fitzgerald Kennedy must soon die die die die . . . ."

The envelope was found on June 6, 1968, by Police Officer Young, who was "assigned to security at the rear of the Sirhan residence" and had the duty of guarding the place to keep unauthorized persons away. Young testified that he made a "search" of the Sirhan residence rear yard, at the back of which there was a fence. Several boxes of trash were in the rear yard, and Young stated that he found the envelope "laying in a box of trash . . . . There was garbage, lots of papers . . . and this was partly folded and wadded up, lying in the trash." When subsequently asked whether when he made "a search [he] was looking for . . . whatever [he] could find," the officer replied, "Not at the moment. I had . . . a paper cup of coffee, and I walked over there to drop it in the trash and seeing here is quite a bit more trash, and the trashman apparently hadn't been able to get in yet, and I threw it in the trash and that is when I noticed this envelope and it had writing on it." He picked it up out of curiosity, looked at it, and later delivered it to another officer.

Officer Young did not have a search warrant. ■■■ The burden is on the prosecution to justify a search or seizure without a warrant. (*People v. Edwards, supra,* 71 Cal.2d 1096, 1099; *People* v. *Marshall,* 69 Cal.2d 51, 56 [69 Cal.Rptr. 585, 442 P.2d 665].) At the trial the prosecution, in seeking to sustain its burden, relied upon *People* v. *Bly,* 191 Cal.App.2d 352, 357 [12 Cal.Rptr. 542], which states that "It can hardly be said that papers discarded to the trash can are the object of an illegal search and seizure." *Bly,* however, was disapproved after defendant's trial in *People* v. *Edwards, supra,* page 1105.

In *Edwards* officers found marijuana during a search of the contents of trash cans that were in the "open backyard area" behind the defendant's residence, a few feet from the back door. The officers were thus required to trespass upon the defendant's property in order to make the search. The marijuana itself was not visible without "rummaging" in the receptacle. *Edwards* declared that the appropriate test to be applied in determining whether there was an illegal search and seizure was "whether the

person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion" and that under that test the search was unlawful.

We applied the principles set forth in *Edwards* in *People* v. *Krivda,* 5 Cal.3d 357, 365 [96 Cal.Rptr. 62, 486 P.2d 1262] [cert. granted, 405 U.S. 1039 (31 L.Ed.2d 579, 92 S.Ct. 1307)]. There contraband was concealed in paper sacks within trash barrels and was not visible without emptying or searching through the barrels' contents; the barrels were placed on the parkway adjacent to the sidewalk for collection. We held that the defendants had a reasonable expectation of privacy that their trash would not be rummaged through and picked over by the police acting without a warrant and that this expectation was violated by unreasonable governmental intrusion.[20]

In the instant case, unlike *Edwards* and *Krivda,* the officer did not find the evidence by rummaging through the trash. Although Officer Young used the word "search" in describing his discovery of the envelope, his heretofore recited testimony indicates that at least part of the envelope was visible without any object being moved.

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. *Ker* v. *California,* 374 U.S. 23, 42-43 (1963); *United States* v. *Lee,* 274 U.S. 559 (1927); *Hester* v. *United States,* 265 U.S. 57 (1924)." (*Harris* v. *United States,* 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069, 88 S.Ct. 992].) Even if an officer may have committed a trespass, his observations of matters in plain view are under some circumstances admissible. (See, e.g., *People* v. *Terry, supra,* 70 Cal.2d 410, 427-428 [cert. den. 399 U.S. 911; rehg. den. 400 U.S. 858]; *People* v. *King,* 5 Cal.App.3d 724, 725-727 [85 Cal.Rptr. 461]; *People* v. *Willard,* 238 Cal.App.2d 292, 298 et seq. [47 Cal.Rptr. 734].)

Here the officer who found the envelope was stationed in the rear yard of the Sirhan residence to keep intruders away. Defendant's mother and brothers lived in the house,[21] and they and others undoubtedly went into the rear yard. On each side of the Sirhan residence was another house in close proximity thereto. Under the circumstances defendant did not

---

[20] *Krivda* also rejected the contention that the principles in *Edwards* should be applied prospectively only.

[21] After the assassination defendant's mother was taken to "another place," where she stayed for several days before returning home.

exhibit an expectation of privacy as to objects in plain view in his rear yard, and any such expectation would have been unreasonable. (Cf. *People v. Bradley,* 1 Cal.3d 80, 83-84 [81 Cal.Rptr. 457, 460 P.2d 129]; *People v. King, supra,* 5 Cal.App.3d 724, 725-726.)

In *People* v. *Bradley, supra,* 1 Cal.3d 80, the officers while pursuing a felony investigation discovered marijuana plants in a "rear yard area." The premises consisted of a house that faced the street; a driveway which was east of the house and terminated in a garage at the rear of the house; defendant's residence, which was attached to the rear of the garage; and a large "fenced-in yard" to the west of defendant's residence. The extent and manner of the fencing were not shown. The marijuana plants were partially covered by foliage, and it could be inferred that at least part of the plants was in plain view of anyone within a foot of the tree. The plants were located a scant 20 feet from defendant's door to which presumably delivery men and others came, and the front house, as well as defendant's house, apparently had access to the yard.

In *People* v. *King, supra,* 5 Cal.App.3d 724, the officers in the course of investigating a felony walked up a driveway by a home to the rear edge of the house where they observed stolen property in plain sight in the back yard. The stolen property could not be seen from the sidewalk but could be seen from the driveway and (the court inferred) from windows of adjacent buildings.

Although there manifestly are differences in the facts between this case and *Bradley* and *King,* in our opinion those differences do not warrant a different result here than in *Bradley* and *King* as to objects in plain sight in the back yard.

What writing on the envelope was visible before Officer Young picked it up and examined its exterior surfaces is not established by the record.[22] However, Young's conduct in this regard was not a search since it did not violate the privacy upon which defendant justifiably relied (see *Katz* v. *United States,* 389 U.S. 347, 353 [19 L.Ed.2d 576, 583, 88 S.Ct. 507])

We recognize that four United States Supreme Court justices have declared that a limit on the plain view doctrine is that the discovery of the evidence must be inadvertent. (See *Coolidge* v. *New Hampshire,* 403 U.S. 443, 469-471 [29 L.Ed.2d 564, 585-586, 91 S.Ct. 2022].) Even if there is such a requirement, here it may be inferred from the heretofore recited evidence that Young's discovery of the envelope was inadvertent. In this

---

[22]The envelope, as heretofore stated, was "partly folded and wadded up, lying in the trash." Some of the writing on the envelope consists of mere scribbling or words such as "disposed of properly."

case, unlike *Coolidge*, there was not "advance police knowledge of the existence and location of the evidence, police intention to seize it, and the ample opportunity for obtaining a warrant." (403 U.S. at p. 482 [29 L.Ed. 2d at p. 592].)

Defendant's objection to the envelope was on grounds other than that the envelope was "communicative" or "testimonial" in nature so that its very nature precluded it from being the object of reasonable search and seizure (see *Warden* v. *Hayden, supra,* 387 U.S. 294, 302-303; *People* v. *Thayer, supra,* 63 Cal.2d 635, 642-643; see generally A.L.I., Model Code of Pre-arraignment Procedure, *supra,* § 1.03). The issue whether the envelope's very nature precluded it from being the object of a reasonable search and seizure therefore will not be reviewed on appeal.

We conclude that the court did not err in admitting the envelope found in the yard.

### 4. *Other Claims of Error with Respect to Admission of Evidence*

■■■ Defendant contends that it was error to admit testimony of an admission by him since the admission was made in the context of an offer to plead guilty. On direct examination defendant admitted having shot Senator Kennedy but stated, "I don't remember shooting him." On cross-examination of defendant after the prosecution elicited testimony that defendant was neither sorry nor proud that the senator was dead the following questioning occurred: "Q. But you are not sorry? A. No, sir, because I have no way of—no exact knowledge, sir, of having shot him. Q. Well, the other day right here in this courtroom did you not say: 'I killed Robert Kennedy wilfully, premeditatively, with twenty years of malice aforethought' —did you say that? A. Yes, sir, I did." Defense counsel made no objection to the admission on the ground now urged but stated that he would bring out on redirect the surrounding circumstances.

Thereafter on redirect examination of defendant defense counsel elicited testimony showing that those circumstances were as follows:

During proceedings outside the presence of the jury defense counsel informed the court of a disagreement between himself and defendant regarding the calling of certain witnesses and stated that defendant desired to address the court. Defendant then stated that he wanted to plead guilty to first degree murder. The court asked him what he wanted to do about the penalty, and he replied, "I will ask to be executed, sir." The court inquired why he wanted to do "this," and he answered "That is my prerogative." The court stated, "No, it isn't. Now, when we come to accepting a plea, you have to give me a reason." Defendant then stated "I killed

Robert Kennedy wilfully, premeditatively, with twenty years of malice aforethought; that is why."

Defendant testified further that: The court subsequently stated it would not accept the plea. The court also told defendant, among other things, that any further interruptions by him in the trial would result in his being restrained. Defendant was at the time angry with his attorneys over the above stated disagreement.

Since no objection was made at the trial on the ground now urged to the admission, defendant is precluded from making the claim of error on appeal. ■ It is the general rule, of course, that questions relating to the admissibility of evidence will not be reviewed on appeal absent a specific and timely objection in the trial court on the ground sought to be urged on appeal. (Evid. Code, § 353; Pen. Code, § 1259; *People v. Floyd, supra,* 1 Cal.3d 694, 717; *People v. De Santiago, supra,* 71 Cal.2d 18, 22; *People v. Washington, supra,* 71 Cal.2d 1061, 1083.

■ Furthermore, the admission was admissible under the circumstances of this case. Evidence of an offer to plead guilty or of a withdrawn guilty plea is made inadmissible by statutes. (Evid. Code, § 1153; Pen. Code, § 1192.4; *People v. Quinn,* 61 Cal.2d 551, 554-555 [39 Cal.Rptr. 393, 393 P.2d 705]; *People v. Hamilton,* 60 Cal.2d 105, 112-114 [32 Cal.Rptr. 4, 383 P.2d 412]; *People v. Wilson,* 60 Cal.2d 139, 155-156 [32 Cal.Rptr. 44, 383 P.2d 452].)[23] The obvious purpose of the statutes is to promote the public interest by encouraging the settlement of criminal cases without the necessity of a trial. (See *People v. Quinn, supra; People v. Hamilton, supra; People v. Wilson, supra* [each so stating with respect to Pen. Code, § 1192.4].) In view of that purpose it seems clear that the Legislature intended to exclude solely withdrawn guilty pleas and *bona fide* offers to plead guilty and did not intend to exclude outbursts by an angry defendant during the trial even if accompanied by an expression of a desire to plead guilty. Such outbursts, of course, would not lead to the settlement

---

[23]Evidence Code section 1153 provides "Evidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action is inadmissible in any action . . . ."

Penal Code section 1192.4, as it read at the time of Sirhan's trial, provided: "If the defendant's plea of guilty pursuant to Section 1192.1, 1192.2 or 1192.3 of this code be not accepted by the prosecuting attorney and approved by the court, the plea shall be deemed withdrawn . . . . The plea so withdrawn may not be received in evidence in any criminal . . . action . . . ."

Penal Code sections 1192.1 through 1192.3, at the time in question, permitted a defendant to enter a conditional plea specifying the degree of crime or the punishment and when accepted by the prosecutor and approved by the court the defendant could not be punished for a higher degree of crime or by a more severe punishment than that specified in the plea.

of the criminal case without a trial and ordinarily would not end the trial but instead would merely disrupt it. Here it is apparent that Sirhan's admission was made during such an outburst rather than during a bona fide offer to plead guilty.[24]

Defendant also appears to complain of the receipt of the evidence showing the circumstances surrounding his admission but since that evidence was introduced by defense counsel defendant may not now complain. (*People* v. *Moran,* 1 Cal.3d 755, 762 [83 Cal.Rptr. 411, 463 P.2d 763]; *People* v. *Feldkamp,* 51 Cal.2d 237, 241 [331 P.2d 632].) Moreover, his complaint appears to be that the evidence was inadmissible since it constituted an offer to plead guilty, and for the reason heretofore stated the exclusionary rule does not apply to the evidence in question.

5. *Claim that Defendant's Constitutional Rights Were Violated by Having Prosecution Initiated by an Indictment Rather Than an Information*

Defendant contends that he was denied due process and equal protection because the prosecution was initiated by an indictment rather than an information. He notes that a defendant who is proceeded against by way of an information has certain rights (e.g., right to counsel at preliminary hearing (Pen. Code, § § 858, 859 and 860; see *Jennings* v. *Superior Court,* 66 Cal.2d 867, 874 [59 Cal.Rptr. 440, 428 P.2d 304]), to confront and cross-examine witnesses (Pen. Code, § 865), and to present evidence (Pen. Code, § 866; see *Jennings* v. *Superior Court, supra,* at p. 880), that comparable rights are not accorded to a defendant who is indicted (see Pen. Code, § 939.7; *People* v. *Rojas,* 2 Cal.App.3d 767, 771 [82 Cal.Rptr. 862]; *People* v. *Dupree,* 156 Cal.App.2d 60, 64-65 [319 P.2d 39]; *People* v. *Dale,* 79 Cal.App.2d 370, 376 [179 P.2d 870]; Witkin, Cal. Criminal Procedure (1963) pp. 166-167), and that no standards guide the prosecutor in selecting between the two alternative procedures.

The use of indictments in all cases warranting serious punishment was the rule at common law (*Smith* v. *United States,* 360 U.S. 1, 9 [3 L.Ed.2d 1041, 1047, 79 S.Ct. 991]), and is required in certain federal prosecutions by the Fifth Amendment of the federal Constitution. It has long been the rule in this state, however, that felonies may be prosecuted by either indictment or information. (Cal. Const., art. I, § 8; Pen. Code, § § 682, 737, 739, 917 and 949.) Although there are differences between the two procedures, a defendant who is proceeded against by an indictment

---

[24]It is thus unnecessary to consider whether admissions made by a defendant in the context of a bona fide offer to plead guilty come within the exclusionary rule of Evidence Code section 1153 and Penal Code section 1192.4.

is not denied due process or equal protection. (*In re Wells,* 20 Cal.App.3d 640, 649 [98 Cal.Rptr. 1]; *People* v. *Pearce,* 8 Cal.App.3d 984, 986-989 [87 Cal.Rptr. 814]; *People* v. *Newton,* 8 Cal.App.3d 359, 388 [87 Cal. Rptr. 394]; *People* v. *Rojas, supra,* 2 Cal.App.3d 767, 771; *People* v. *Flores,* 276 Cal.App.2d 61, 65-66 [81 Cal.Rptr. 197].) It similarly does not violate due process to initiate a prosecution by an information rather than an indictment. (*Hurtado* v. *California,* 110 U.S. 516, 538 [28 L.Ed. 232, 239, 4 S.Ct. 111, 292]; *In re Terry,* 4 Cal.3d 911, 926 [95 Cal.Rptr. 31, 484 P.2d 1375].)

In support of his contention defendant relies upon cases in which it was held that constitutionally impermissible classifications were contained in the legislation or rule there in question (e.g., *McLaughlin* v. *Florida,* 379 U.S. 184 [13 L.Ed.2d 222, 85 S.Ct. 283] [classification based on race]; *Douglas* v. *California,* 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814] [classification based on indigency]; *Skinner* v. *Oklahoma,* 316 U.S. 535 [86 L.Ed. 1655, 62 S.Ct. 1110] [classification requiring sterilization under certain circumstances of persons convicted of larceny but not of those convicted of embezzlement]). The provisions which concern us here do not contain such a classification.

### 6. *Asserted Error in Failure to Hold Evidentiary Hearing*

Defendant contends that the court erred in refusing to hold an evidentiary hearing on the question whether the exclusion of veniremen opposed to the death penalty results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. After the death penalty was returned defendant requested such a hearing and stated that he wished to call only one witness, Hans Zeisel, a professor at the University of Chicago Law School, and through him to offer some "documents" (the exact nature of which was not specified). After defendant outlined the general substance of Zeisel's proffered testimony, the court denied the motion. Defendant then had marked for identification a document entitled "Some Data on Juror Attitudes Toward Capital Punishment" (1968) by Zeisel, which, defendant stated, contained "a more specific offer of proof" regarding Zeisel's testimony. The portion of the document dealing specifically with whether a juror's attitude towards capital punishment affects his determination regarding guilt states that it contains an "improved analysis of data" on which the author briefly reported in a preliminary manuscript, "Some Insights into the Operation of Criminal Juries" (Confidential First Draft, November 1957). That preliminary manuscript was before the United States Supreme Court in *Witherspoon.* (See

*Witherspoon* v. *Illinois,* 391 U.S. 510, 517, fn. 10 [20 L.Ed.2d 776, 782, 88 S.Ct. 1770].) Other portions of the document presented at the instant trial contained matters such as data on certain characteristics that might distinguish jurors who have scruples against the death penalty from those who do not (e.g., statistics regarding approval of capital punishment by age, race, and sex).

*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, left undecided the question whether the exclusion of veniremen opposed to capital punishment necessitates setting aside the judgment as to guilt.[25] The petitioner in that case cited (1) two surveys involving a total of 387 students and (2) the preliminary manuscript by Zeisel, which contained the results of a study based upon interviews with 1,248 jurors in New York and Chicago. The court stated, "The data adduced by the petitioner . . . are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt,[11]" and footnote 11 stated in part that during the post-conviction proceeding there under review no request was made to submit evidence on the matter and that "We can only speculate, therefore, as to the precise meaning of the terms used in those studies, the accuracy of the techniques employed, and the validity of the generalizations made." (See also *Bumper* v. *North Carolina,* 391 U.S. 543, 545 [20 L.Ed.2d 797, 800, 88 S.Ct. 1788].)

The petitioners in *In re Anderson,* 69 Cal.2d 613, 621 [73 Cal.Rptr. 21, 447 P.2d 117], requested an evidentiary hearing regarding their claim that the exclusion of veniremen opposed to capital punishment results in an unrepresentative jury on the issue of guilt and substantially increases the risk of conviction, and we denied the request on the ground that they were then not ready for such a hearing and that the study they had underway did not warrant what would amount to an indeterminate stay of the judicial process. We subsequently denied other similar requests on the ground that the petitioner did not state whether or not he was prepared for an evidentiary hearing and gave no indication of the nature of the evidence he intended to introduce. (*People* v. *Robles,* 2 Cal.3d 205, 219 [85 Cal. Rptr. 166, 466 P.2d 710]; *People* v. *Brawley,* 1 Cal.3d 277, 298 [82

---

[25]*Witherspoon* declared (fn. 18, p. 520 [20 L.Ed.2d, p. 784]), that "in some future case" a defendant convicted by a jury from which the state had excluded only those prospective jurors who stated that they would not even consider returning a death penalty "might still attempt to establish that the jury was less than neutral with respect to *guilt.* If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment."

Cal.Rptr. 161, 461 P.2d 361] [cert. den. 400 U.S. 993 (27 L.Ed.2d 441, 91 S.Ct. 462)]; *In re Eli,* 71 Cal.2d 214, 218 [77 Cal.Rptr. 665, 454 P.2d 337] [cert. den. 396 U.S. 1020 (24 L.Ed.2d 512, 90 S.Ct. 589)]; *In re Arguello,* 71 Cal.2d 13, 17 [76 Cal.Rptr. 633, 452 P.2d 921].)

The instant case differs from *Anderson, Robles, Brawley, Eli,* and *Arguello* in that here defendant stated that he was prepared for an evidentiary hearing and specified the general nature of the evidence he intended to introduce. The case also differs from *Witherspoon* in that a request was made in the lower court to submit evidence on the matter. However, in our opinion the court did not err in denying the request, since defendant's offer of proof was insufficient to require such a hearing. Although a hearing might have eliminated uncertainties as to matters with respect to which the Supreme Court in *Witherspoon* stated it could only speculate such as the meaning of terms in the studies before the Supreme Court in that case, the offer of proof failed to show that the data upon which Zeisel based his opinion was significantly more substantial than that adduced by the petitioner in *Witherspoon.* To the contrary the data relied upon by Zeisel relating specifically to whether a juror's attitude toward the death penalty affects his determination regarding guilt was the same data that was analyzed in his preliminary manuscript, which was before the Supreme Court in *Witherspoon.*

### 7. *Attacks on Petit and Grand Juries*

#### A. Petit Jury

Defendant contends that since voter registration lists were used as the sole source of petit jurors, he was convicted by a jury that was unconstitutionally selected. Before the trial a motion to quash the petit jury panel was made, based in part upon the claim that the jury commissioners failed to utilize sources of names of prospective jurors that would give the best chance of assuring a representative cross-section of the community. At the hearing on the motion evidence was presented that names of jurors were obtained by random selection solely from the registrar of voters' list.

The use of voter registration lists as the sole source of jurors is not constitutionally invalid (*People* v. *Gibbs,* 12 Cal.App.3d 526, 538-539 [90 Cal.Rptr. 866]; *Ganz* v. *Justice Court,* 273 Cal.App.2d 612, 623 [78 Cal.Rptr. 348]; *People* v. *Hess,* 104 Cal.App.2d 642, 669-670 [234 P.2d 65] [app. dism. for want of substantial federal question, 342 U.S. 880 (96 L.Ed. 661, 72 S.Ct. 177)]; see *People* v. *White,* 43 Cal.2d 740, 749 [278 P.2d 9] [cert. den. 350 U.S. 875, 876 (100 L.Ed. 774, 76 S.Ct. 120)]), at least in the absence of a showing that the use of those lists

**750**

resulted "in the systematic exclusion of a 'cognizable group or class of qualified citizens'" (*United States* v. *Dangler* (5th Cir.) 422 F.2d 344, 345; *Camp* v. *United States* (5th Cir.) 413 F.2d 419, 421 [cert. den. 396 U.S. 968 (24 L.Ed.2d 434, 90 S.Ct. 451)]; *Grimes* v. *United States* (5th Cir.) 391 F.2d 709, 710 [cert. den. 393 U.S. 825 (21 L.Ed.2d 96, 89 S.Ct. 87)]),[26] or that there was "discrimination in the compiling of such voter registration lists." (*United States* v. *Parker* (9th Cir.) 428 F.2d 488, 489 [cert. den. 400 U.S. 910 (27 L.Ed.2d 150, 91 S.Ct. 155)]; *Gorin* v. *United States* (1st Cir.) 313 F.2d 641, 644; in accord *People* v. *Lynch,* 14 Cal. App.3d 602, 605 [92 Cal.Rptr. 411]; *People* v. *Newton,* 8 Cal.App.3d 359, 389-390 [87 Cal.Rptr. 394].)

 Defendant did not make such a showing at the hearing on his motion to quash the petit jury panel but asserts in his brief on appeal that "Statistics and common knowledge indicate that black people, members of other racial minority groups, poor white people and people generally with less formal education have much less representation on voter lists than do white people, businessmen and people of higher income, and people who have undergone formal education to a greater degree. The data indicates that *in the North,* black voting lags between twenty and thirty per cent behind white voting. . . . *Appellant . . . is forced to rely upon this data,* which does not specifically refer or apply to Los Angeles County alone, *since neither the Jury Commissioner nor the Registrar of Voters keep any statistics as to the composition of their lists.*" (Italics added.)

Although defendant does not so state, presumably he desires that this court take judicial notice of the alleged facts that are assertedly of common knowledge. (See Evid. Code, §§ 452, subd. (g), and 459.) The Attorney General asserts that the alleged facts are not of common knowledge, and we agree.

The "statistics" and "data" referred to by defendant in his brief on appeal were not introduced at the hearing on his motion to quash the petit jury panel, but defendant claims that they appear in the transcript in People v. Castro, Los Angeles Superior Court Crim. A-232902, and he argues in effect, without citation of authority, that the trial court erred in not taking judicial notice of that transcript. However, we need not consider the matter of judicial notice since it seems apparent from defendant's quoted allegation that the "statistics" and "data" he refers to do not relate to Los Angeles County. Thus even had evidence thereof been introduced

---

[26]Those who do not choose to register cannot be considered a "cognizable group." (*United States* v. *Dangler, supra, Camp* v. *United States, supra, Grimes* v. *United States, supra.*)

at the hearing on the motion to quash the petit jury panel it would not have established that in Los Angeles County there was systematic exclusion of a cognizable group or class of qualified citizens or discrimination in the compiling of the voter registration lists.

Defendant further contends that in view of certain alleged facts it is a denial of due process and equal protection under the federal Constitution for jurors for the central district of the superior court to be selected from voter registration lists for the entire county, whereas, according to defendant, veniremen for every other district of that court are selected from that district only. The petit jury panel was not challenged on this basis before a juror was sworn. Although the contention is not literally made a basis for a challenge to the jury panel by statute,[27] such a challenge constitutes an appropriate method of raising the contention (cf. *People* v. *Carter,* 56 Cal.2d 549, 568-569 [15 Cal.Rptr. 645, 364 P.2d 477]), assuming that there is any basis for it. Defendant asserts that the argument was made in the transcript in People v. Castro, *supra,* Los Angeles Superior Court Crim. A-232902, and that the Castro transcript was "adopted by the defense." It appears that at the time of the motion for a new trial defense counsel requested judicial notice be taken of the Castro transcript in connection with his motion to quash the *indictment,* and that the court declined to do so. The foregoing action by defense counsel manifestly did not constitute a raising of the present contention in the trial court, and even if the contention had been made at the time of the motion for a new trial it would not have been within the time specified in Penal Code section 1060, which provides: "A challenge to the panel must be taken before a juror is sworn . . . ." Furthermore, facts that are alleged in defendant's brief and relied upon by him to support the contention are not shown by the record, and it is settled that " 'on a direct appeal from a judgment a reviewing court will not consider matters outside the record . . . .' " (*People* v. *Gardner,* 71 Cal.2d 843, 854-855 [79 Cal.Rptr. 743, 457 P.2d 575].) Defendant claims that the facts appear in the Castro transcript and presumably seeks to have us take judicial notice of that transcript. However, the device of our taking judicial notice "in no way relieves defendant of the responsibility he had for raising his challenge in the court below."

---

[27]Penal Code section 1059 provides: "A challenge to the panel can be founded only on a material departure from the forms prescribed in respect to the drawing and return of the jury in civil actions, or on the intentional omission of the sheriff, marshal, constable, or other officer, to summon one or more of the jurors drawn." Defendant does not contend that there is any material departure of form or intentional omission to summon.

(*People* v. *Neal,* 271 Cal.App.2d 826, 836-837 [77 Cal.Rptr. 65] [cert. den. 396 U.S. 946 (24 L.Ed.2d 249, 90 S.Ct. 387)].) We conclude that the issue is not properly before us. (See *People* v. *Gardner, supra; People* v. *Schader,* 71 Cal.2d 761, 784 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Neal, supra.*)

## B. Grand Jury

 A motion to quash the indictment was made on the ground, among others, that the "Grand Jury was selected by a means that inherently discriminated against persons and groups of persons of minority races, to wit: Persons of foreign ancestry and descent, such as Spanish, Mexican, Oriental, Arabian, and other similar identifiable groups," and the motion alleged in part that defendant is a Palestinian Arab by descent. The court denied the motion after an evidentiary hearing.

On appeal defendant asserts that in selecting grand jury nominees there was purposeful discrimination against "Spanish surnamed Mexican Americans," a class not expressly set forth in the motion.[28] Although he also asserts on appeal that "racial minorities" have been "chronically under-represented on the Los Angeles County Grand Jury," he points to nothing showing that "racial minorities" as a whole constitute an identifiable class in Los Angeles County (see *Hernandez* v. *Texas,* 347 U.S. 475, 478-479 [98 L.Ed. 866, 870, 74 S.Ct. 667]), or have been unconstitutionally discriminated against.

Extended consideration of defendant's argument regarding the asserted discrimination against "Spanish surnamed Mexican Americans" is unnecessary since he is not a member of that group and, as hereinafter

---

[28]In support of his argument defendant relies in large part upon the transcripts and exhibits in People v. Castro, Los Angeles Superior Court Crim. A-232902, and People v. Montez, Los Angeles Superior Court Crim. A-244906. The records in those cases were not introduced into evidence at the instant proceedings. Before the hearing on Sirhan's motion to quash the indictment, discussions were had between the court and counsel regarding the Castro transcript, and, although at one point the court stated it had understood that the Castro transcript was to be used, subsequent remarks of the court, before and during the hearing on the motion to quash the indictment, made it clear that the court wanted to "stay away from" that transcript and to have defense counsel call witnesses instead. At the time of the motion for a new trial defense counsel asked the court to take judicial notice of the Castro transcript in connection with his challenge to the grand jury, and the court declined to do so, stating "I don't feel it is proper to make [the Castro transcript] a part of record because the Court, in my original ruling did not examine or consider that evidence. . . ." Defendant now apparently seeks to have us take judicial notice of the Castro and Montez records, although he cites no authority concerning judicial notice. It is unnecessary for us to consider the matter of judicial notice in light of our disposition of the assertion.

discussed, the new rule announced in *Peters* v. *Kiff,* 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163] (i.e., that a defendant, whatever his race, may challenge his conviction on the grounds that some race was arbitrarily excluded from the grand jury that indicted him) does not govern this case, in which the proceeding was instituted before the *Peters* decision was announced.

*People* v. *White, supra,* 43 Cal.2d 740, 753 [cert. den. 350 U.S. 875, 876], which involved a challenge to the petit jury panel, states, "It is generally recognized that as a general rule, errors and irregularities in making up a jury list will not invalidate the list when the person objecting is not a member of the group discriminated against." That rule has repeatedly been applied in cases involving attacks upon grand juries or petit juries. (*Salisbury* v. *Grimes* (5th Cir.) 406 F.2d 50, 51; *Woodruff* v. *Breazeale,* 291 F.Supp. 130 [affd. 401 F.2d 997]; *In re Wells,* 20 Cal.App.3d 640, 649 [98 Cal.Rptr. 1]; *Ganz* v. *Justice Court, supra,* 273 Cal.App.2d 612, 619-621; *Butler* v. *State,* 285 Ala. 387 [232 So.2d 631, 634-635]; *Blanton* v. *State,* 249 Ark. 181 [458 S.W.2d 373, 376] [cert. den. 401 U.S. 1003 (28 L.Ed.2d 539, 91 S.Ct. 1240)]; *State* v. *Lea,* 228 La. 724 [84 So.2d 169, 170-171] [cert. den. 350 U.S. 1007 (100 L.Ed. 869, 76 S.Ct. 655)]; see Witkin, Cal. Criminal Procedure (1963) § 331, pp. 324-325, and 1969 Supp., § 331, pp. 117-118.) An exception to the general rule may exist if it appears that the defendant was prejudiced by the asserted purposeful discrimination (see, e.g., *Woodruff* v. *Breazeale, supra,* at p. 132; *Ganz* v. *Justice Court, supra,* but here defendant points to nothing showing such prejudice.[29]

After *People* v. *White, supra,* 43 Cal.2d 740, 753, and the above cited cases in accord with *White* were decided, the United States Supreme Court filed its decision in *Peters* v. *Kiff, supra,* 407 U.S. 493 [June 22, 1972]. The decision in *Peters* was rendered long after the proceeding in the instant case was instituted and the case tried. In *Peters* the petitioner alleged that Negroes were systematically excluded from the grand jury that indicted him and the petit jury that convicted him in a Georgia court. The court's judgment in that case was announced in an opinion by Justice Marshall, joined in by Justices Douglas and Stewart. Justice Marshall declared that

---

[29]Defendant cites cases expressing a different viewpoint as to whether a defendant may complain if he is not a member of a group assertedly unconstitutionally excluded (*Allen* v. *State,* 110 Ga. 56 [137 S.E.2d 711]; *State* v. *Madison,* 240 Md. 265 [213 A.2d 880, 885]; *Walter* v. *State,* 208 Ind. 231 [195 N.E. 268, 270-271, 98 A.L.R. 607]; see *Labat* v. *Bennett* (5th Cir.) 365 F.2d 698, 723 [cert. den. 386 U.S. 991 (18 L.Ed.2d 334, 87 S.Ct. 1303)]), but the rule that has been followed in this state is that set forth above.

"whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process," and Justice Marshall indicated that the defendant need not present proof of actual harm.

A concurring opinion in *Peters* by Justice White, joined in by Justices Brennan and Powell, states that he would implement the policy of a federal statute which prohibits disqualifying citizens on grounds of race by permitting the petitioner, a white man, "to challenge his conviction on the grounds that Negroes were arbitrarily excluded from the grand jury that indicted him. This is the better view, and it is time that we now recognize it *in this case* and *as the standard governing criminal proceedings instituted hereafter.*" (Italics added.) Justice White had theretofore recognized that "there is no case in this Court setting aside a conviction for arbitrary exclusions of a class of citizens from jury service where the defendant was not a member of the excluded class" and that "the courts of appeal, reflecting the generally accepted constitutional view, have rejected claims such as petitioner presents here."

A dissent in *Peters* by Chief Justice Burger, joined in by Justices Blackmun and Rehnquist, after noting that exclusions from juries on account of race are unlawful, states that "The real issue is whether such illegality necessarily voids a criminal conviction absent any demonstration of prejudice, or basis for presuming prejudice to the accused," and the dissent evidently believed that the illegality did not have that effect absent such a demonstration.

Neither Justice Marshall nor Chief Justice Burger in *Peters* expressed disagreement with Justice White's position on retroactivity of the new rule in *Peters* or discussed that issue. In our opinion Justice White's position as to retroactivity should be followed, and we adopt it.

■ Defendant also contends that the nomination and review of prospective grand jurors by the judiciary (1) is the performance of a non-judicial function in violation of the separation of powers doctrine (art. III, Cal. Const.) and (2) is inconsistent with the policy of "judicial detachment and neutrality," which lies behind that doctrine, and violates the federal Constitution. Although defendant does not so state, he presumably therefore regards the indictment as invalid. Defendant's motion to quash the

indictment did not raise the foregoing contentions.[30] In *People* v. *Tipton,* 90 Cal.App.2d 103, 104 [202 P.2d 330], where a motion to set aside a judgment was made on the ground that the grand jury which indicted the defendant was illegal, the court stated, that "[W]here an indictment appears regular on its face and a defendant fails to demur or move to set it aside, he waives any irregularities in the organization or impanelment of the grand jury." (See also *People* v. *Dale, supra,* 79 Cal.App.2d 370, 375; *People* v. *Meraviglia,* 73 Cal.App. 402, 407 [238 P. 794]; *People* v. *Godfrey,* 100 Cal.App. 233, 234 [279 P. 1031].) Similarly by failing to raise the above contentions in his motion to quash the indictment, defendant is precluded from making them on appeal.

The judgment is modified to provide a punishment of life imprisonment instead of death for the murder and as so modified is affirmed.

Wright, C. J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**McCOMB, J.**—I concur in the opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the proposed modification of the judgment.

Appellant's petition for a rehearing was denied July 26, 1972.

---

[30]Defendant asserts that the contentions are made in the Castro transcript and that he "adopted that transcript." At the hearing on the motion for a new trial defense counsel requested judicial notice be taken of the Castro transcript in connection with his motion to quash the indictment, which motion was based on the assertion that specified groups were unconstitutionally discriminated against. Apart from the matter of timeliness, the foregoing manifestly did not constitute raising of the present contentions in the trial court.